The **MONTGOMERY INDEPENDENT SCHOOL DISTRICT,** Petitioner,

v.

Joanne **DAVIS,** Respondent.

No. 99–0859.

Supreme Court of Texas.

Argued April 5, 2000.

Decided Dec. 7, 2000.

John David Thompson, III, Raymond L. Gregory, Bracewell & Patterson, Houston, for petitioner.

Kevin F. Lungwitz, Texas State Teachers Association, Austin, for respondent.

Justice HANKINSON delivered the opinion of the Court, in which Chief Justice PHILLIPS, Justice ENOCH, Justice BAKER, Justice O'NEILL, and Justice GONZALES joined.

This teacher term-contract nonrenewal case presents us with our first opportunity to interpret Education Code chapter 21, subchapter F, specifically, section 21.259. The Montgomery Independent School District Board of Trustees declined to renew Joanne Davis' contract. The Commissioner of Education affirmed the Board's decision. The trial court reversed the commissioner's decision, and the court of appeals affirmed the trial court's judgment. 994 S.W.2d 435. We hold that, when reviewing a hearing examiner's recommendation under Education Code § 21.259, a school board cannot make additional findings of fact, but that subject to certain other statutory restrictions, the board retains the authority to make the ultimate policy decision of whether to renew a teacher's contract. In this case, however, because the school board's actions exceeded its statutory authority and its decision is not supported by substantial evidence, we affirm the judgment of the court of appeals.

Joanne Davis taught science at Montgomery Junior High School under four one-year term contracts. Toward the end of her last one-year term, the Montgomery Independent School District's Board of Trustees accepted the district superintendent's proposal to not renew Davis' contract. The Board gave several reasons for proposing to not renew the contract, each of which was included in the district's employment policy as grounds for nonrenewal. *See* Tex. Educ.Code § 21.203(b) (employment policies must contain reasons for not renewing teacher's contract at the end of a school year). Only one of the reasons, "failure to maintain an effective working relationship, or maintain good rapport with parents, the community, or colleagues," is at issue here.

After being notified of the proposed nonrenewal, Davis requested a hearing under Education Code § 21.207(a). When a teacher requests a hearing after receiving notice of proposed nonrenewal, the Legislature has given school boards a choice between two procedures: the board may conduct a hearing itself or opt to have a hearing examiner conduct the hearing. The procedure the board chooses determines the board's role in the hearing process. If the board chooses the first procedure, it conducts its own hearing under section 21.207(b), and renders a decision under section 21.208(b). A teacher aggrieved by the board's decision may appeal to the Commissioner of Education. Tex. Educ.Code § 21.209. The commissioner reviews the board's decision, and may not substitute his or her judgment for that of the board "unless the board's decision was arbitrary, capricious, unlawful, or not supported by substantial evidence." *Id.* § 21.209. Either party may then appeal the commissioner's decision to district court. *Id.* § 21.307.

Alternatively, instead of conducting a hearing on its own, under section 21.207(b) "[t]he board may use the process established under Subchapter F," thereby requesting the Commissioner of Education to appoint an independent hearing examiner to conduct an evidentiary hearing and make findings of fact, conclusions of law, and a recommendation on the proposed nonrenewal to the board. *See* Tex. Educ. Code § 21.257. If a school board chooses the hearing-examiner process, the board's role is then more like that of the commissioner's when the board conducts the hearing under section 21.207; the board sits in effect as a reviewing tribunal and acts on the examiner's recommendation subject to the limitations set out in section 21.259, which we discuss below. A party aggrieved by the board's decision may then appeal to the commissioner, with the board's decision subject to the same standard described above, and a party aggrieved by the commissioner's decision may appeal to district court. *Id.* §§ 21.303(a), 21.307.

In this case, the Board chose the hearing-examiner process. After a five-day hearing, the hearing examiner concluded that the school district failed to prove by a preponderance of the evidence any of the reasons for nonrenewal, *see* Tex. Educ. Code § 21.256(h), and recommended that Davis' contract be renewed. The hearing examiner specifically determined in finding of fact number 17 that "Joanne Davis did not fail to maintain an effective working relationship or maintain good rapport with parents, the community, or colleagues," and made a corresponding conclusion of law. After considering the hearing examiner's recommendation and the parties' oral argument, the Board voted to not renew Davis' contract. *See* Tex. Educ. Code § 21.258.

Davis then appealed the Board's decision to the Commissioner of Education. *See* Tex. Educ.Code § 21.301(a). The commissioner did not issue a written decision, thereby affirming the Board's decision by operation of law. *See id.* § 21.304(b). Davis next appealed to district court under Education Code § 21.307. The district court reversed the commissioner's decision and ordered Davis reinstated. The court

of appeals affirmed. 994 S.W.2d 435. The Board then petitioned this Court for review.

We first focus on whose decision is properly before us. We note that the decision subject to review by the judicial system is that of the Commissioner of Education. TEX. EDUC.CODE § 21.307(a). A court can reverse the commissioner's decision on a teacher's contract if the decision is not supported by substantial evidence or if the commissioner's conclusions of law are erroneous. *Id.* § 21.307(f). In this case, however, because the commissioner affirmed the Board's decision without a written decision, our focus remains on the Board's decision. Also, apart from reviewing the Board's decision under section 21.307, we are presented with questions of statutory interpretation concerning certain challenged actions taken by the Board, and whether those actions are authorized under subchapter F.

To support its decision to not renew Davis' contract, the Board first deemed the hearing examiner's finding of fact number 17, that Davis did not fail to maintain an effective working relationship or good rapport with parents, the community, or colleagues, to be a conclusion of law. It rejected the hearing examiner's corresponding conclusion of law and adopted its own contrary conclusion of law, that the administration proved by a preponderance of the evidence that Davis failed to maintain an effective working relationship or good rapport. The Board then made three additional findings of fact, based on what it stated was undisputed evidence: (1) that Davis had referred to students by a derogatory name in the presence of other educators; (2) that she had more requests for transfer from her classes than did any other teacher; and (3) that more complaints were made about her classes than any other classes. Based solely on these additional facts in support of its legal conclusion that the administration proved that Davis failed to maintain effective working

relationships or good rapport, the Board decided to not renew Davis' contract.

The district court and court of appeals both agreed with Davis that these actions by the Board were not authorized under subchapter F, specifically, section 21.259. *See* 994 S.W.2d at 438. We must decide: (1) whether the Board was authorized under subchapter F to act as it did with respect to the hearing examiner's findings of fact and conclusions of law when it decided to reject the examiner's recommendation and not renew Davis' contract; and (2) whether the Board's decision was supported by substantial evidence. We first review the hearing-examiner process established by the Legislature.

Subchapter F sets out the procedure for using independent certified hearing examiners to conduct hearings and make recommendations on certain teacher-employment decisions. When a school board terminates a teacher's contract (other than at the end of a probationary contract) or suspends a teacher without pay, the teacher may request a hearing under this subchapter. But when a board proposes to not renew a teacher's contract, only the board may opt to use the subchapter F process. TEX. EDUC.CODE § 21.251. If the board chooses subchapter F, the parties may agree on a particular person to serve as their hearing examiner or have the Commissioner of Education assign one. *Id.* § 21.254. Hearing examiners must meet stringent requirements to be certified by the Commissioner of Education. *Id.* § 21.252(a). They must be licensed to practice law, but they and their associated law firms may not be the agent of or represent a school district, a teacher in a dispute with a school district, or an organization of school employees, administrators, or boards. *Id.* § 21.252(b). By regulation hearing examiners must apply for certification every year, and must participate in continuing education in school law and civil-trial advocacy, in addition to having significant experience in civil litigation, administrative law, school law, or labor law.

19 TEX. ADMIN. CODE § 157.41. The commissioner keeps a list of certified examiners to which examiners are added chronologically, and when a hearing examiner is requested, the commissioner assigns the next examiner on the list who lives within reasonable proximity to the school district. TEX. EDUC.CODE § 21.254.

Subchapter F charges the hearing examiner with conducting the hearing "in the same manner as a trial without a jury in a district court"; the Texas Rules of Evidence apply, the proceedings are recorded, the school district has the burden of proof by a preponderance of the evidence, and the teacher has the right to be represented by counsel, hear the evidence supporting the charges, cross-examine adverse witnesses, and present evidence of his or her own. TEX. EDUC.CODE § 21.256. Following the hearing, the examiner must make a written recommendation that includes findings of fact and conclusions of law, and may include a proposal for granting relief. *Id.* § 21.257. The hearing examiner then sends a copy of the recommendation to each party, the president of the school board of trustees, and the commissioner. *Id.*

Once the school board receives the recommendation, it "shall consider the recommendation and record of the hearing examiner" and allow each party to present oral argument. TEX. EDUC.CODE § 21.258(b). Section 21.259 then mandates that the board take several specific actions with regard to the hearing examiner's recommendation, and permits it to reject or change certain parts of the recommendation only if certain conditions are met:

(a) ... the board of trustees ... shall announce a decision that:

(1) includes findings of fact and conclusions of law; and

(2) may include a grant of relief.

(b) The board ... may adopt, reject, or change the hearing examiner's:

(1) conclusions of law; or

(2) proposal for granting relief.

(c) The board ... may reject or change a finding of fact made by the hearing examiner only after reviewing the record of the proceedings before the hearing examiner and only if the finding of fact is not supported by substantial evidence.

(d) The board ... shall state in writing the reason and legal basis for a change or rejection made under this section.

*Id.* § 21.259. Whether the Board's actions comport with this section is the focus of the parties' arguments in this case.

The Board makes essentially one argument—that its actions were authorized because school districts must have the power to interpret their own policies, and that only the Board can ultimately determine what "failure to maintain an effective working relationship, or maintain good rapport, with parents, the community, or colleagues" means in that school district. If by applying or interpreting this policy the hearing examiner is permitted to determine the ultimate question of whether a teacher's contract should be renewed, then the Board claims that the examiner has improperly usurped the Board's authority to apply and interpret its own nonrenewal policy. The Board emphasizes that such a result would have the consequence of defeating one of the Legislature's goals in the 1995 Education Code revisions, preserving local control and management of the public schools. *See* TEX. EDUC.CODE §§ 7.003, 11.151(b); *Ysleta Indep. Sch. Dist. v. Meno,* 933 S.W.2d 748, 752 (Tex. App.—Austin 1996, writ denied). Because the Board views the hearing examiner's finding of fact number 17 as a legal conclusion that Davis did not violate district policy, it argues that the finding was actually an ultimate policy determination only the Board could make. The Board further claims that it could make its own additional factfindings based on the general reservation of power to school boards in Education Code §§ 7.003, 11.151(b), and in the absence of a prohibition on such additional factfinding in section 21.259.

Davis responds that the hearing examiner was entitled to find as a matter of fact that she did not fail to maintain effective working relationships or good rapport because that determination is an ultimate fact that turns on the resolution of many underlying evidentiary facts. Moreover, Davis adds, while section 21.259 permits the Board to reject or change a finding of fact, it can do so only if the finding is not supported by substantial evidence, which finding of fact 17 clearly was. *See* Tex. Educ.Code § 21.259(c). She further argues that section 21.259 does not permit the Board to add findings of fact precisely because the Board's review of findings under that section is limited to a substantial evidence review. Finally, even if the Board were authorized to add findings, Davis argues that the findings the Board added do not support its purported conclusion of law that Davis failed to maintain effective working relationships or good rapport.

■ We cannot accept either party's interpretation of the statute. The Board's reading is too expansive, while Davis' is too restrictive. The plain language of section 21.259 delineates the Board's role once it chooses to have a hearing examiner serve as the factfinder. Subpart (a) requires a school board to "announce" a decision including findings of fact and conclusions of law, and subparts (b), (c), and (d) then clearly limit what the board may do when reviewing the hearing examiner's findings of fact and conclusions of law. Tex. Educ.Code § 21.259. A board may adopt, reject, or change the hearing examiner's conclusions of law or proposal for granting relief. *Id.* § 21.259(b). A board may reject or change a finding of fact only if the fact is not supported by substantial evidence. *Id.* § 21.259(c). Section 21.259(d) then requires the board to "state in writing the reason and legal basis for a change or rejection made under this section." *Id.* § 21.259(d). Nowhere in the specific provisions of section 21.259 has the Legislature provided for a school board to

find facts in addition to those found by the hearing examiner. We cannot read into subchapter F's detailed administrative scheme permission for a board to find additional facts when the Legislature did not include that authority. *See Sorokolit v. Rhodes,* 889 S.W.2d 239, 241 (Tex.1994) (emphasizing that a court may not enlarge the unambiguous language of a statute beyond its ordinary meaning). Moreover, the limits this scheme sets on a board's authority do not defeat the local control or management preserved in Education Code §§ 7.003 or 11.151(b) because the school board itself chooses to have an independent hearing examiner act as factfinder. Having chosen to delegate the factfinding role to the hearing examiner, a board cannot then ignore those findings with which it disagrees and substitute its own additional findings. In its review of a hearing examiner's recommendation, a board can reject or change the hearing examiner's findings only when those findings are not supported by substantial evidence. Tex. Educ.Code § 21.259(c).

If a board could find additional facts, resolving conflicts in the evidence and credibility disputes, it would then be serving as its own factfinder despite delegating the factfinding role to a hearing examiner, and the process of using an independent factfinder would be meaningless. An independent factfinder is integral to the structure of the hearing-examiner process; permitting a school board to select an independent factfinder avoids having the board, a party to the employment contract and a party to the dispute, act as its own factfinder when reviewing the employment decision of its own administration. The Legislature has further protected the independent nature of the hearing-examiner process by requiring the board to state in writing the reason, including the legal basis, for any change or rejection it makes under section 21.259. Tex. Educ.Code § 21.259(d).

We do not suggest that a school board must simply accept an examiner's recom-

mendation; under section 21.259(b)(1), the board may reject or change conclusions of law or the proposal for relief. The ability to reject or change conclusions of law preserves a school board's authority and responsibility to interpret its policies. The board has the power to apply those policies to the examiners' findings and the undisputed evidence by rejecting or changing the examiner's conclusions of law or proposal for relief. But when a board reviews the facts of a case, the Legislature has clearly limited it to conducting a substantial evidence review. TEX. EDUC.CODE § 21.259(c). This limitation means that once a board has chosen to delegate the factfinding role to a hearing examiner, it cannot then sit in effect as a second factfinder, reweighing evidence and judging witnesses' credibility in support of finding additional facts. *See Ysleta Indep. Sch. Dist. v. Meno*, 933 S.W.2d 748, 751 n. 5 (Tex.App.—Austin 1996, writ denied) (noting that, under substantial evidence review, "[t]he reviewing tribunal is restricted to [the] record, save in extraordinary circumstances, and it may not re-weigh the evidence, find facts or substitute its judgment for that of the original tribunal").

We emphasize, however, that while an independent factfinder decides the facts under subchapter F, the Board retains the authority to make the ultimate decision of whether the facts demonstrate that board policy was violated. Section 11.163 charges school boards with adopting employment policies for their districts, and section 21.203(b) requires that those policies include reasons for nonrenewal. TEX. EDUC.CODE §§ 11.163, 21.203(b). Because school boards have "the exclusive power and duty to govern and oversee the management of the public schools of the district," TEX. EDUC.CODE § 11.151(b), under the statutory scheme a school board must be the ultimate interpreter of its policy, subject to the limits established by the Legislature in its provisions for administrative and judicial review.

This is in some ways similar to the statutory standards or agency policies at issue in other administrative settings. In those settings, ultimate decisions about whether a standard or policy has been met or breached can have the same effect as a conclusion of law or a mixed question of law and fact. *See, e.g., Texas Health Facilities Comm'n v. Charter Medical–Dallas, Inc.*, 665 S.W.2d 446, 453 (Tex.1984) (discussing "ultimate findings" in relation to statutorily required criteria when reviewing a commission order granting certificates of need to two hospitals); *Hunter Indus. Facilities, Inc. v. Texas Natural Resource Conservation Comm'n*, 910 S.W.2d 96, 104 (Tex.App.—Austin 1995, writ denied) (explaining that "ultimate findings" concerning compliance with statutory standards under the Solid Waste Disposal Act have the same legal effect as conclusion of law or mixed question of law or fact).

We also note that while in some ways similar to procedures under the Administrative Procedure Act, the provisions governing the hearing-examiner process in the Education Code impose greater restrictions on a school board than the APA does on state agencies. For example, under the APA, an agency may reject a proposal for decision without reviewing the record. *See* TEX. GOV'T CODE § 2001.062. By contrast, under the Education Code the Legislature directs that a school board "shall consider the recommendation and record of the hearing examiner," and may reject or change a finding of fact "only after reviewing the record of the proceedings before the hearings examiner." TEX. EDUC. CODE §§ 21.258(a), 21.259(c). A state agency must give written reasons for changes it makes to a proposal only if the State Office of Administrative Hearings conducts the hearing, but not if an agency hearing officer conducts the hearing. *See* TEX. GOV'T CODE § 2001.058(e). A school board, on the other hand, must provide a written explanation in all termination, nonrenewal, and suspension cases for any change or rejection made under section

21.259. TEX. EDUC.CODE § 21.259(d). While the administrative scheme we review today is different from that of the APA, and specifically not subject to the APA, TEX. EDUC.CODE § 21.256(b), a school board is entitled to adopt, reject, or change a hearing examiner's conclusions of law, and make the ultimate decision of whether to renew a particular contract, so long as the school board's decision is supported by substantial evidence and free from legal error. *See id.* §§ 21.259(b), 21.307(f). Thus, the label attached, "finding of fact" or "conclusion of law," is not determinative; the focus is on whether the issue determined is ultimately one of policy, and if so, whether a school board's decision is supported by substantial evidence and free of erroneous legal conclusions. *See id.* § 21.307(f).

■ In this case, the Board was entitled to determine that Davis' contract should not be renewed based on the facts that were found by the hearing examiner, so long as the Board's determination, in the commissioner's view, was not arbitrary, capricious, or unlawful, and was supported by substantial evidence. The commissioner did not issue a written decision, thereby affirming the Board's decision as a matter of law. Section 21.307(f) requires us to affirm the commissioner's decision unless that decision is not supported by substantial evidence or contains erroneous conclusions of law. Substantial evidence review is a limited standard of review, requiring "only more than a mere scintilla," to support an agency's determination. *Railroad Comm'n v. Torch Operating Co.,* 912 S.W.2d 790, 792–93 (Tex.1995). The question whether an agency's determination meets that standard is one of law. *Firemen's & Policemen's Civil Serv. Comm'n v. Brinkmeyer,* 662 S.W.2d 953, 956 (Tex.1984); *Board of Firemen's Relief & Ret. Fund Trs. v. Marks,* 150 Tex. 433, 242 S.W.2d 181, 183 (1951). The commissioner's affirmance of the Board's ultimate decision to not renew must be based on

facts amounting to substantial evidence. *See* TEX. EDUC.CODE § 21.307(f).

■ The facts properly adopted by the Board do not amount to substantial evidence in support of its decision to not renew Davis' contract. The sole legal conclusion made in support of the decision to not renew was that Davis failed to maintain an effective working relationship, or good rapport, with parents, the community, or colleagues. In its written decision, the Board first adopted twelve of the hearing examiner's findings concerning the history of the case. It then adopted twenty-one of the findings on Davis' failure rates and TAAS test results that related to the issue of whether Davis failed to maintain satisfactory student progress. The Board concluded, based on those facts, that the administration did not prove by a preponderance of the evidence that Davis failed to maintain satisfactory student progress. The Board then made three additional factfindings, which it now claims support its conclusion that Davis failed to maintain effective working relationships or good rapport. The Board argues that its additional findings are proper because they are based on undisputed evidence the hearing examiner did not address in his recommendation.

We disagree with the Board that the hearing examiner's failure to make a specific finding on any particular fact means that the Board is then authorized to make an additional finding. Nothing in the statute requires the hearing examiner to make findings on specific matters of which he remains unconvinced by a preponderance of the evidence. The Legislature has placed the burden on the school district to prove the basis for its reasons for nonrenewal by a preponderance of the evidence. *See* TEX. EDUC.CODE § 21.256(h). Of the Board's additional findings in this case— that (1) Davis referred to students by a derogatory term, (2) had more requests for transfer out of her classes, and (3) had more complaints about her than other teachers did—the hearing examiner may

have considered the particular testimony offered not credible or material to the issue of rapport.

With regard to the first additional finding, Principal Paul Hatch testified that he had heard Davis refer to students by a derogatory term, while the assistant principal testified that Davis used the term once in his office when referring to "a student or some students" after a particular incident. Davis admitted to referring to one student by that term in the assistant principal's office, but denied referring to students by that term at any other time or ever using that term in front of Hatch. Thus the only undisputed evidence, that is, evidence both parties agree is true, is that Davis used the term one time in the assistant principal's office. The Board may rely on that undisputed evidence in the record to support its legal conclusion. But even looking solely to that undisputed evidence, the record does not show how that isolated incident, while demonstrating clearly unprofessional and inappropriate conduct, in the absence of evidence that anyone else heard, knew about, or reacted to the comment, demonstrates that Davis violated the policy concerning rapport with parents, the community, or colleagues. The lack of a material connection between that undisputed incident and the Board's grounds for nonrenewal may have been precisely why the hearing examiner did not make a finding on this point. While the Board could consider the undisputed evidence that the incident occurred, it could not use that incident as a basis for nonrenewal without some material connection to the grounds given to Davis as a basis for nonrenewal. *See* Tex. Educ.Code § 21.203(b); *Seifert v. Lingleville Indep. Sch. Dist.,* 692 S.W.2d 461, 463 (Tex.1985).

■ With regard to the second and third additional findings, although the school counselor, Joan Boswell, and Principal Hatch, did testify about the requests for transfer and the complaints, the record reveals inconsistencies and conflicts in the evidence that may have led the hearing examiner to discount their testimony. For example, with regard to requests for transfer, the assistant principal testified that some twenty students requested transfer forms following Davis' presentation at one open house, while Boswell had said the number was approximately six to eight. With regard to the complaints, the hearing examiner, in his written recommendation to the Board, did discuss a number of the complaints individually and explained why they did not demonstrate lack of rapport. More importantly, the hearing examiner made a specific determination, which the record supports, that the testimony of three other people, including Boswell, contradicted Hatch's testimony, and that other actions Hatch took with respect to Davis created doubts about his credibility. As the factfinder, the hearing examiner is the sole judge of the witnesses' credibility and the weight to be given their testimony, and is free to resolve any inconsistencies. *See Webb v. Jorns,* 488 S.W.2d 407, 411 (Tex.1972) ("It is an old and familiar rule that the fact finder may resolve conflicts and inconsistencies in the testimony of any one witness as well as in the testimony of different witnesses."); *Transmission Exch. Inc. v. Long,* 821 S.W.2d 265, 271 (Tex.App.—Houston [1st Dist.] 1991, writ denied); *Blackmon v. Piggly Wiggly Corp.,* 485 S.W.2d 381, 384 (Tex.Civ.App.— Waco 1972, writ ref'd n.r.e.).

The dissenting opinion misconceives the hearing examiner's role in the subchapter F process by stating that the hearing examiner "refused" to make findings on the evidence the Board relies on to support its additional findings. As we explained above, nothing in the statute requires the hearing examiner to make findings on matters of which he is unpersuaded by a preponderance of the evidence or which are immaterial, especially when the evidence is conflicting and credibility is in issue. Moreover, in this case the hearing examiner issued a seventeen-page recommendation. Far from refusing or failing to address the evidence concerning lack of

rapport, the hearing examiner included three pages discussing in detail the complaints and transfer requests. He pointed out that Davis and Hatch signed a professional growth plan that sought a reduction in the number of complaints and requests for transfer, and that she accomplished that goal. He found that there was no evidence of any parent complaints during the second semester of Davis' last term, and that "[t]he evidence is overwhelming that [Davis] maintained constant contact with the parents and students to an even greater degree than was required by the district." The hearing examiner further noted that in the two previous years, Hatch had evaluated Davis as meeting expectations or exceeding expectations in the category of maintaining a professional relationship with colleagues, students, parents, and the community. He also explained in detail the basis for his "significant questions concerning the credibility of Principal Hatch." Thus contrary to the dissent's view, the hearing examiner did not refuse to make findings or fail to address evidence regarding Davis' rapport. Moreover, we must assume, consistent with the hearing examiner's findings, that he did not find the testimony that the Board cited in support of its additional facts to be persuasive or material. *See Golden Eagle Archery, Inc. v. Jackson,* 24 S.W.3d 362, 373 (Tex.2000).

The dissenting opinion's misconception of the hearing examiner's role stems from its disregard of the procedural elements the Legislature established in subchapter F to ensure that the hearing-examiner process is fair and efficient for both teachers and school boards. The Legislature maintained local control by giving school boards alone the option to choose the hearing-examiner process in nonrenewal proceedings. Once a school board chooses that process, however, under the statute the board has delegated the factfinding role to the hearing examiner. Hearing examiners are not advocates for either side, but neutral and independent. By resolving conflicts in disputed evidence, ignoring credibility issues, and essentially stepping into the shoes of the factfinder to reach a specific result, the dissenting opinion not only disregards the procedural limitations in the statute but takes a position even more extreme than that argued for by the Board. Even the Board admits that the hearing examiner's factfindings in this case are supported by substantial evidence. And the Legislature has made plain that when substantial evidence supports those findings, the Board is not free to reject or change those findings to reach a different result. As the Texas Commissioner of Education submits in his amicus curiae brief, "If these limitations [in section 21.259] are ignored, the statutes [in subchapter F] are rendered meaningless."

Thus we conclude that the Board did not have authority within the statutory scheme of subchapter F to make the additional findings, and while the Board could rely on the undisputed evidence in the record to reach its conclusion of law, that evidence— concerning the incident in the assistant principal's office—does not support the only basis for the nonrenewal, that Davis failed to maintain effective working relationships or good rapport. Without those impermissible additional findings or undisputed evidence to support its conclusion of law, the Board's ultimate determination cannot stand.

Because the only basis for not renewing Davis' contract is not supported by substantial evidence, the court of appeals properly affirmed the trial court's judgment reversing the commissioner's decision. Accordingly, we affirm the judgment of the court of appeals.

Justice OWEN, joined by Justice HECHT and Justice ABBOTT, dissenting.

The net effect of the Court's decision is that it allows a state hearing examiner to make policy decisions that the Legislature intended local school boards to make. The Court's decision discourages school boards from using hearing examiners because if

they do, they risk ceding their legitimate policy-making authority. While the Court gives lip service to the primacy of school boards in making policy decisions, the Court does not apply that principle in a meaningful way. Instead of reviewing the school board's policy determination in this case to see if it was supported by substantial evidence, the Court instead reviews the hearing examiner's ultimate conclusion, which was rejected by the school board and the Commissioner of Education, to see if the hearing examiner's conclusion was supported by substantial evidence. This in an improper application of the Education Code.

The Montgomery Independent School District decided that Joanne Davis' teaching contract should not be renewed because she "failed to maintain an effective working relationship, or maintain good rapport, with parents, the community, or colleagues." The undisputed facts the Board cited as underpinning this conclusion were that 1) Davis referred to a student using a crude, pejorative term, 2) there were more requests for transfers from her classes than from any other teacher's, and 3) there were more complaints about her classes than any other teacher's. Because there was substantial evidence to support the Board's conclusions and, accordingly, substantial evidence to support the decision of the Commissioner of Education, I dissent.

## I

When Joanne Davis was told that her contract would not be renewed, Montgomery Independent School District had in place a written policy that set forth twenty-six bases on which a teacher's contract might not be renewed. The reasons for non-renewal included "[f]ailure to maintain an effective working relationship, or maintain good rapport, with parents, the community, or colleagues."

The Court and I agree that the question of whether Davis failed to maintain an effective working relationship or to main-

tain good rapport was a legal conclusion. 34 S.W.3d at 566. That determination is necessarily a policy-laden one, and the ultimate call was for the Montgomery Independent School District's board of trustees, not a state hearing examiner, as long as the Board's decision was not "arbitrary, capricious, or unlawful" and was supported by substantial evidence. TEX. EDUC.CODE § 21.303(a). The issue in this case is what evidence the Board can rely on to support its conclusion of law.

At Davis' hearing, the School District requested the hearing examiner to make certain findings of fact based on undisputed evidence. The hearing examiner refused to do so. Accordingly, in reviewing the hearing examiner's findings and recommendation, the Board made additional findings of fact that (1) were based on undisputed evidence and (2) were not contrary to any findings made by the hearing examiner.

The Education Code provides that when a school board elects to allow a state hearing examiner to conduct a hearing on the non-renewal of a teacher's contract, the board nevertheless must make findings of fact and conclusions of law, and the board may reject or change an examiner's fact-findings if they are not supported by substantial evidence:

### § 21.259. Decision of Board of Trustees or Board Subcommittee

(a) [T]he board of trustees or board subcommittee shall announce a decision that:

(1) includes findings of fact and conclusions of law; and

(2) may include a grant of relief.

(b) The board of trustees or board subcommittee may adopt, reject, or change the hearing examiner's:

(1) conclusions of law; or

(2) proposal for granting relief.

(c) The board of trustees or board subcommittee may reject or change a finding of fact made by the hearing ex-

aminer only after reviewing the record of the proceedings before the hearing examiner and only if the finding of fact is not supported by substantial evidence.

(d) The board of trustees or board subcommittee shall state in writing the reason and legal basis for a change or rejection made under this section.

TEX. EDUC.CODE § 21.259.

The fact that the Code specifically provides that a school board may reject or change a finding of fact if it is not supported by substantial evidence is critical in properly applying the Code. *See Id.* § 21.259(c). It makes no sense to say, as the Court does today, that when a hearing examiner refuses to make a finding regarding facts in the record, the board is powerless to rely on those facts.[1] In this case, if the hearing examiner had made express findings that there were not more requests for transfers from Davis' classes than from any other teacher's or that there were not more complaints concerning Davis' classes than any other teacher's, the Board could have rejected or changed those findings if they were not supported by substantial evidence. *Id.* If a school board can reject or change a finding of fact and rely on a finding as changed, then it necessarily follows that a school board is entitled to make a finding of fact that is supported by the evidence when the examiner has refused to address that matter, as long as the school board's finding does not conflict with a finding by the hearing examiner that is supported by substantial evidence. The hearing examiner cannot wrench the power to reject or change findings from the Board by refusing to make a finding.

The upshot of the Court's decision is this: a hearing examiner will now be able to make findings of fact about matters that support his or her ultimate recommendation and can ignore parts of the record

that do not support those recommendations. Under the Court's interpretation of the Code, the hearing examiner can preclude a school board, the Commissioner of Education, and reviewing courts, from relying on record evidence simply by failing to make findings on those parts of the factual record. A straightforward reading of the Code does not support this result.

The Board's conclusion and its findings should be upheld based on the record in this case, to which I turn.

## II

The Board reached the ultimate conclusion, after reviewing the record, that: "[t]he Administration proved by a preponderance of the evidence that Davis failed to maintain an effective working relationship, or maintain good rapport, with parents, the community, or colleagues." In support of this conclusion, the Board made findings about the number of requests for transfer out of Davis' classes and the number of complaints about Davis:

42. It is undisputed that there were more requests for transfers from Joanne Davis' classes than from any other teacher's classes at Montgomery Junior High School.

43 It is undisputed that there were more complaints concerning Joanne Davis's classes than any other teacher's classes at Montgomery Junior High School. (Record citations omitted.)

The Commissioner of Education was required to uphold the Board's judgment in this matter unless its decision was arbitrary, capricious, or unlawful, or was not supported by substantial evidence. TEX. EDUC.CODE § 21.303(a). Since the Commissioner did uphold the Board's determination, this Court should review the Commissioner's decision under the substantial

---

1. The Court says, "the Board was entitled to determine that Davis' contract should not be renewed based on the facts that were found by the hearing examiner, so long as the

Board's determination, in the commissioner's view, was not arbitrary, capricious, or unlawful, and was supported by substantial evidence." 34 S.W.3d at 565–566.

evidence rule, and we may not reverse that decision unless it was not supported by substantial evidence or unless the Commissioner's conclusions of law were wrong. *Id.* at § 21.307(e), (f). The record reflects that the Commissioner's decision to uphold the Board's decision was supported by substantial evidence and was not contrary to any findings of fact made by the hearing examiner.

The Court says that "the Board admits that the hearing examiner's findings of fact in this case are supported by substantial evidence." 34 S.W.3d at 568. This is true, but that is not what this case is about. The Board's complaint is that the hearing examiner should have made additional findings in light of the undisputed evidence. The hearing examiner instead made selective findings. The Board explained in its decision rejecting the hearing examiner's recommendation that the hearing examiner chose to ignore undisputed, substantial evidence that supported the Board's decision not to renew Davis' contract:

> Although the Hearing Examiner prepared the record, he failed to make *any* findings of fact regarding undisputed evidence of several serious issues. In the absence of any findings of fact by the Hearing Examiner concerning the allegation that Ms. Davis failed to maintain working relationships or good rapport with parents, the community, or colleagues, we adopt these additional findings of fact. They are not inconsistent with any findings of fact made by the independent Hearing Examiner and are based on undisputed evidence. Proposed findings of fact similar to these were submitted by Montgomery ISD to the independent Hearing Examiner prior to his decision, but rather than making findings of fact based on the undisputed evidence, including testimony from Davis' own witnesses, he failed to address this evidence in any way and did not acknowledge this evidence in the record. (Emphasis in original.)

The hearing examiner did not make any findings that address the three additional findings that the Board made, which were that (1) there were more requests for transfers from Davis' classes than any other teacher, (2) there were more complaints about Davis than any other teacher, and (3) Davis referred to a student using a crude, derogatory term. Since the Court has chosen to disregard entirely the evidence that supports the Board's findings and conclusions, I think it is helpful to detail that evidence before I turn to a more specific discussion of the mischaracterizations the Court makes regarding the record.

At the beginning of the 1995–1996 school year, Montgomery Junior High School held an open house to which all parents were invited. There was testimony at the hearing that one purpose of the open house was to put the school's "best foot forward." For each class that a teacher would be teaching, he or she held a ten-minute session with parents. Michael Anderson, the assistant principal, testified that after each of Davis' ten-minute sessions, there were lines of parents who were asking that their children be transferred out of Davis' classes. He said that "literally, each setting—after each segment that presentations were given, there was a line of parents; and one of them would say something, and then they'd all chime in and talk about, you know, they wanted to get their kid out of Ms. Davis's class." Anderson testified that parents of at least twenty students requested transfer forms. According to Anderson, nothing like this had ever happened before, and this incident was highly unusual. His recollection of typical comments parents had made were that "[t]hey were unhappy about the gruffness of the teacher, they perceived somewhat of a condescending attitude of the teacher to the parents in the room—and about their kids." No comments of this nature were received about any other teacher. Joan Boswell, a counselor at the school, testified that about

"two to three, maybe four" parents also came up to her the night of the open house and requested scheduling changes to move their children out of Davis' classes.

The testimony of school officials about what happened at this open house was corroborated by a parent's letter, which said:

Near the end of the evening we had the honor of meeting Ms. Davis. My husband & I and other parents were very unimpressed. She insulted my son, my husband & I. As I have relayed the incident to Mr. Hatch on several occasions by phone [sic].

Ms. Davis stood in front of a classroom full of Parents & New Students to MJH School and made clear her Student (will do's & wonts [sic] ). She then lowered herself to walk over to our Son and say "And some students think I'm a Witch. Right Michael?"

Had my husband & I not been so taken aback, we would have vacated the room at once.... Other parents had concerns & not so kind comments about the teacher as we exited the class room.

This letter was written later in the school year, in November, and the open-house incident was one of the reasons this parent gave for requesting that her son be transferred to another class. That request was honored. The hearing examiner's comments about this parent's concerns were, "Radican–Parent mis-perception of comment at open house. Resolved by transfer of student at mid-semester." The hearing examiner made no other findings about the open house incident.

Apparently, not all of the parents who had requested transfer forms on the night of the open house ultimately turned them in. However, after the open house, as the school year progressed, the record reflects that requests for transfers from Davis' classes, other than Radican's, were made. Boswell testified that during the fall of 1995, she recalled that six to eight written requests for schedule changes were received. Boswell also testified that over the

two and one-half years that she had been a counselor at Montgomery Junior High, there were between fifteen and twenty written requests for transfers from Davis' classes and an additional thirty to forty verbal requests. There was only one other teacher who had "close to that many." No "other teacher [was] close to that number." The principal of the school, Paul Hatch, confirmed this. None of the hearing examiner's findings contradicted, much less rejected, this evidence.

Written requests for transfer and written parent complaints are in the record. There were several in October of 1995. Some of the complaints were similar. One parent wrote that Davis' explanation about his son's poor performance during the first six weeks of 1995 was not credible. This father said in his letter that at a parent-teacher conference, Davis told him that she had given his son three zero's that brought his 97 average down to 72, and that Davis also "assured [the father] that [his son] fell apart the very last week of the 6 weeks." The father complained that Davis actually gave his son "a 0 at the three week mark," and that "lead[s][me] to question Mrs. Davis's ability to know what student she is talking about at any given time." The father also wrote that if his son "had a 0 at the three week mark, I should have been notified then, not the Saturday after the end of the first six weeks. Mrs. Davis never attempted to contact me prior to this time, nor did she contact my wife who works on the campus." The letter closed by saying:

I have always been supportive of my sons' teachers. In fact, I teach my children that if there is a problem at school, I will take the teachers [sic] word over theirs. This is the first time since my sons started school that I have not been able to do this.

During this same time, in early October 1995, a parent wrote that her child had received a 41 on a test at the beginning of the first six-week period. The parent's

letter says that she "made a point to talk to Mrs. Davis on parent night" about the grade and asked Davis to call if there were any future problems with her son's grades. This parent did not receive a call from Davis until after the six-weeks grades were posted. She was then told that her son had failed. The letter says, "I feel very uncomfortable about this teacher.... If there is another Science teacher he could be changed to for 8th period I would welcome the change. [My son] is happy and doing well in all of his other classes and does not want to change his other classes."

Later that month, this same parent again wrote to the principal about Davis, pressing for the transfer of her child to another science class. The parent said:

As you know through our many conversations since the first six weeks of school, [I] am very concerned about [my son's] Science teacher, Mrs. Davis. I believe a teacher has a great influence in a child's life and can leave a lasting impression whether it be good or bad. I believe we have a bad situation here. I have always been one that gives people chances if we have any problems, but under the circumstances, knowing what I know about this teacher, I feel that it would be in my son's best interest to change him out of Mrs. Davis' Science class.... If you can, please make this change as soon as possible. I am tired of my son coming home upset from school.... I don't want this teacher ruining [my son's] attitude about school.

This mother also testified at the hearing. She reiterated what her letter had said, which was that she had met with Davis after her child received a 41 on a test and specifically asked that Davis call if there were any other problems. Davis did not call before the next report card came, on which this child received an F in Davis' class and an "N" regarding his conduct in that class. The parent testified that she was "totally blown away" that Davis had not called and that she was "just very concerned because I had never had an experience like this with any of my other children" or their teachers. This student was "very happy in all of his other classes" but was "stressed" in Davis' class. This student was transferred from Davis' class to another science class, and the child had no difficulties with teachers the rest of the year. The mother noticed a change for the better in her child's behavior after the transfer.

The hearing examiner's comment regarding this parent's complaints was: "Parrish Dispute between teacher and student about when test was taken up. Student received 41 on test. Student was having difficult year and failed other classes. Student was transferred at semester break. Testimony revealed the student was willing to continue to deal with teacher, the parent was not." This comment does not conflict with the conclusion that Davis failed to maintain rapport with this parent.

In October 1995, another parent asked that her son be transferred from Davis' class "due to a lack of communication." Notes from a school official indicate that this student had not had conduct problems in other classes, and he had never failed before. The hearing examiner's comment about this situation was, "Solomon—Schedule change requested by parent. Student seems to be passing now. No evidence whether problem was resolved."

In another request for transfer, a parent wrote that in a telephone conversation, Davis was "rude and snotty" when discussing a student's failing grade. The parent had complaints about other matters as well, writing:

Obviously, Ms. Davis hasn't mastered the art of discretion and she truly is quite rude most of the time. I don't want to deal with a teacher that I can't converse with or one who is obviously either incompetent in her job or is to

[sic] disorganized to keep up with the kids [sic] work appropriately.

This same letter said:

I have spoken with other parents who have had the exact same problem with their kids in Ms. Davis [sic] class. I was speaking with [another mother] at the grocery store and She [sic] said that her daughter had recieved [sic] many zeros only to find the papers graded in her note book. Another mother standing in line said she had the same situation.

After this letter was received by the school, Davis recognized that she had mistakenly given this student a zero for failing to turn in a paper even though the paper was in the student's notebook and Davis had graded the paper with an 83. Davis corrected the student's overall grade, as the hearing examiner noted. But that does not change the fact that the letter is evidence that Davis did not maintain good rapport with parents.

Another parent testified at the hearing before the hearing examiner. That parent, whose letter to the school is discussed above, related that one of the "worst incident[s]" leading to his son's transfer out of Davis' class was when his son had lost his textbook. This student's mother was also a teacher at Davis' school. The student found his lost book, but he heard Davis say to another teacher in the hall that his mother had lied about the lost book. The student was very upset and went to his mother's class crying. After this incident, this student's parents requested a meeting with the principal, and the student was transferred from Davis' class at mid-term.

The father of this student testified that although Davis "was always willing to have meetings any time," meetings with Davis did not resolve the problem. His child was transferred at mid-term, and the father was satisfied with the new teacher. The only comment that the hearing examiner had about this family's problems with Davis was "Doucet–Parents requested and received schedule change for what they believed to be to everyone's benefit. Par-

ents had problem with disciplinary action for gum chewing."

There is considerable evidence about parent complaints in years prior to the 1995–96 school year. I relate only a few of those complaints. A parent wrote to Davis about the fact that her daughter's textbook had been stolen, and she could not afford a new one. The letter complained that Davis "confronted [the student] *in front* of the class (her peers) about not being able to afford the book. This is a private matter not to be discussed amongst the entire class. This was embarrassing for [my child] & totally unnecessary." (Emphasis in original.) The hearing examiner's comment regarding this matter was "Brown–Leatham–Dispute over lost book with no evidence of whether the situation was ever resolved one way or the other."

Another parent wrote a letter to the principal requesting that her son be removed from Davis' class. She related that although her child's records reflected that he was a good student and science had been one of his favorite subjects, he was failing in Davis' class. Her son had complained to her that he was "confused with Mrs. Davis in what she does at times." And this parent said, "I feel that another teacher with different teaching methods would make a big difference in his Science grades and attitude." The hearing examiner's comments were, "Medina–Evidence of schedule change. No evidence as to whether transfer or subsequent problems occurred."

Another student's parents wrote to the principal that although their son had been diagnosed with Attention Deficit Hyperactivity Disorder, he was not having trouble in classes other than Davis'. They wrote that Davis "has a very negative attitude when speaking to us concerning [our son]." They continued, "[w]e do not feel [our son] is experiencing a successful year in this particular science class and have asked the counselor, Ms. Boswell, on two separate occasions to have his schedule changed to

include a different science teacher. We are greatly troubled with [his] loss of self-esteem." The hearing examiner's only comment was, "Student has ADHD."

Complaints about Davis were made by students as well. The head of the Science department, Ann Taylor, testified that approximately ten students came to her about Davis. These students said, "they'd prefer to be in another class because they don't feel like they know what's going on." Taylor had never received similar complaints about other science teachers. She said that it was unusual to receive complaints of this nature. Taylor and another teacher tutored these students to help them with their science studies in Davis' class. The hearing examiner made no findings about these student complaints or the need for other teachers to step in to supplement Davis' teaching.

The record also contains a memorandum from one of Davis' colleagues to the principal. Davis, who had three student aides, had requested the librarian's student aide to make copies of some materials. The librarian complained to Davis about this, and apparently there was a confrontation. The librarian's memo says, "I do admit I was exasperated because this was just one more of several times that she [Davis] has used an overbearing tone or attitude and many of the people who deal with her have voiced the same concern." The librarian wrote a note to Davis apologizing for being rude, but also expressing to Davis that "sometimes your approach is a little overbearing." Again, the hearing examiner made no findings about this or other complaints from Davis' colleagues.

These are just some of the complaints and requests for transfers that are in the record. There are others.

There is also another finding of fact made by the Board that supports its conclusion that Davis failed to maintain an effective working relationship or to maintain a good rapport with parents or colleagues. The Board found that Davis had used a pejorative term in speaking about a student.[2] The evidence reflects that one day at school, Davis was very upset about the principal, Hatch. Anderson, the assistant principal, took Davis to his office to try to calm her down. At some point she referred to a student as a "little shit." After the incident Davis wrote a memo to Anderson in which she said:

> In regard to me referring to a student as a "little shit," I apologize if it offended you. The fact of the matter is that I really do like the student in question and used that terminology in an endearing way. Frankly, I have referred to my own children in the same manner—both in their presence and in their absence.

However, at the hearing, Anderson said that based on his observation of Davis when she was making the statement, she had not used the term as one of endearment. Thus the evidence about the tenor of the comment was conflicting. The hearing examiner made no findings whatsoever regarding this incident. The Board could reasonably have concluded that this was another indication that Davis had a negative attitude toward her students and another indication of her inability to establish a rapport with a significant number of her students or their parents. Viewed in connection with all the other evidence of problems that Davis encountered when she dealt with others, this was not an isolated incident, as the Court suggests. The

---

2. The finding was:

41. It is undisputed that Joanne Davis referred to students as "little shits" at school, during the school day, and in the presence of other educators. In fact, Davis never apologized for using the phrase (she only said she was sorry that it offended Mr. Anderson) and said that she used the phrase as a term of endearment. Every educator who testified about the issue, including those who appeared on behalf of Davis, described such conduct as unprofessional. (Record citations omitted.)

Board could have concluded that this incident had a "material connection" to Davis' ability to maintain an effective working relationship or good rapport, the Court's assertion to the contrary notwithstanding, 34 S.W.3d at 567.

### III

Instead of focusing on whether the Board's findings of fact and legal conclusions were supported by substantial evidence, the Court defends the hearings examiner's findings. The Court's first line of defense is that the hearing examiner *might* not have considered evidence about these areas "credible or material to the issue of rapport." 34 S.W.3d at 567. But when a hearing examiner makes no findings at all about particular matters raised by the evidence, a court cannot speculate about what he *might* or *might not* have found. Nor can a court simply assume from a hearing examiner's silence that he rejected all testimony on a subject as lacking in credibility. Yet, that is what the Court does.

The Court says with regard to transfer requests that "the record reveals inconsistencies and conflicts in the evidence that may have led the hearing examiner to discount their [Boswell's and Hatch's] testimony." 34 S.W.3d at 567. The Court concedes that Joan Boswell said that there were at least six to eight requests for transfer out of Davis' classes during the first half of the 1995–96 school year. 34 S.W.3d at 567. If, as the Court speculates, the hearing examiner rejected Boswell's testimony, then we are left with the testimony of Anderson, the assistant principal, that there were at least twenty requests for transfer on a single night, after the open house. Other evidence about transfer requests came from the testimony of parents and letters from parents that were introduced into evidence. But even setting aside that evidence for the moment, the fact remains that the hearing examiner did not make any finding contrary to the Board's finding that there were more requests for transfer from Davis' classes, whatever the number of requests might

have been, than there were from any other teacher's classes.

The Court says that the hearing examiner made a specific finding that Hatch's testimony was not credible because it was contradicted by three other people. 34 S.W.3d at 567. But here again, even if Hatch's testimony is discarded in its entirety, the record is replete with other evidence about requests for transfer and complaints about Davis. The hearing examiner did not discount that large body of evidence, which consisted of written letters from parents; the testimony of parents; the testimony of the assistant principal, a school counselor, and the teacher who was the head of the science department; and a memorandum from another of Davis' colleagues. The hearing examiner accepted that there were numerous complaints and requests for transfer. Indeed, he made specific findings that there were transfers out of Davis' class because parents complained, and the examiner made specific findings that there were a number of complaints from parents.

The Court says that there were three pages in the hearing examiner's decision that addressed rapport. That is true. But the Court does not and cannot cite a single line from the hearing examiner's decision in which he found that there were not more complaints about Davis than any other teacher or that there were not more requests for transfer from Davis' classes than any others.

The hearing examiner did make certain factual observations in support of his legal conclusion that Davis did not fail to maintain an effective working relationship or good rapport. But he said only that the number of actual transfers out of her class during the 1995–1996 school year did not "appear to be an unreasonably large number since, clearly, it is impossible to please everyone." He further observed that there "is no evidence of *any* parent complaints during the second semester of

1995–96." (Emphasis in original.) He also stated:

> The evidence is overwhelming that the teacher maintained constant contact with the parents and students, to an even greater degree than was required by the district. For example, she sent progress reports at the three week mark to every student, not just the student's [sic] who were in danger of failing, as required by the school district. In addition, she regularly met with problem students, both before and after school, and maintained telephone contact with parents. (Record citations omitted.)

Finally, the hearing examiner notes that the principal, Hatch, said in Davis' 1993–94 evaluation that Davis "exceeds expectations" in the category of "maintains a professional relationship with all colleagues, students, parents, and community." Hatch gave Davis a rating of "meets expectations" in the same category for the 1994–95 school year.

None of the foregoing observations or findings preclude the Board from concluding that Davis failed to maintain an *effective* working relationship and failed to maintain *good rapport* with parents or colleagues. Whether the number of *actual transfers* out of Davis' classes was "reasonable" does not address the question of whether the number of requests for transfers and the number of complaints were more than the school received about any other teacher. Nor does the hearing examiner's conclusion about what was a "reasonable" number of actual transfers undercut the Board's ability to conclude that Davis had failed to maintain an effective working relationship and rapport based on the sheer number of requests for transfer and complaints, their tenor, and the amount of time and energy that the school had to expend to deal with them.

The fact that there was no evidence of complaints in the second half of the 1995–96 school year does not mean that the Board was foreclosed from considering the many complaints about Davis in the preceding semester or preceding school years. Similarly, the fact that Davis had frequent communication with parents says nothing about the quality or effectiveness of those communications. The record was replete with evidence that when Davis communicated with parents, she alienated many of them. Nor do the ratings that Hatch gave to Davis in the two years preceding the year in which her contract was not renewed preclude the Board from concluding that, although Hatch thought Davis maintained a "professional" relationship, that relationship was not an effective one, or that Davis failed to maintain good rapport.

More importantly, as detailed above, there is substantial evidence that supports the Board's conclusion that is untouched by the hearing examiner's findings. In the final analysis, the hearing examiner reached an ultimate legal conclusion based on the facts in the record. But the Board was entitled to reach a different legal conclusion based on those same facts as long as that legal conclusion was supported by substantial evidence. Control of schools should remain where the Legislature has placed it, with local school boards.

\* \* \* \* \* \*

Because there was substantial evidence to support the school board's conclusion that Davis failed to maintain an effective working relationship or good rapport with parents or colleagues, and because the Court has misinterpreted the Education Code, I dissent.