# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-06-00666-CV

**Appellant, State of Texas// Cross-Appellant, Mid-South Pavers, Inc.**

**v.**

**Appellee, Mid-South Pavers, Inc.// Cross-Appellee, State of Texas**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT NO. D-1-GN-06-000141, HONORABLE JOHN DIETZ, JUDGE PRESIDING

## O P I N I O N

This appeal arises from a dispute over a highway construction contract between Appellant/Cross-Appellee the Texas Department of Transportation and Appellee/Cross-Appellant Mid-South Pavers, Inc. *See* Tex. Transp. Code Ann. § 201.112 (West Supp. 2007). After Mid-South filed an administrative complaint, which TxDOT denied, a hearing was held before an administrative law judge at the State Office of Administrative Hearings. The ALJ submitted a proposal for decision to the executive director of TxDOT for adoption. In the agency's final order, the executive director rejected several of the ALJ's findings of fact and conclusions of law and substituted his own findings and conclusions in place thereof. Mid-South sought judicial review of the final order in district court, and the district court reversed, finding that the executive director committed error by declining to adopt the ALJ's findings of fact and conclusions of law in the PFD. For the reasons set forth

below, we affirm the district court's judgment reversing the final order in part, and we reverse in part and remand this cause to TxDOT for further proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

### *The highway construction contract*

On December 29, 1998, Mid-South entered into a highway construction contract with TxDOT to repair and re-pave 25.306 kilometers, or approximately 15 miles, of Interstate Highway 20 in Parker County. The contract price was $4,373,977.16. The project required two general tasks: full-depth repairs of the concrete pavement in the driving lanes and complete re-paving of the shoulders and roadway in asphalt. The repaving of the shoulders and roadway was divided into six separate stages: placement of microsurfacing[1] on bridge decks; planing of the shoulders and repaving them with Type B hot mix; placement of the HMAC base; placement of the Petromat;[2] placement of the Type D hot mix asphalt surface on the driving lanes; and placement of pavement markings and markers. All of the work under the contract was to be completed within 135 days. If Mid-South failed to complete the work in a timely manner, the contract allowed TxDOT to impose liquidated damages of $1,000 per day.

The parties held a preconstruction meeting on January 22, 1999.[3] Present at this

---

[1] Microsurfacing is a special hot mix asphaltic concrete (HMAC) slurry that is used to improve skid resistance on the driving lanes of bridges. Microsurfacing is applied in a thinner layer than HMAC pavement.

[2] Petromat is a sheet of fabric that is placed between the roadbed and the asphalt paving.

[3] Although the PFD states the preconstruction meeting was held on January 28, 1999, the record reflects that it was actually held on January 22, 1999.

meeting were Jimmey Bodiford, John Bailey, Allen Boone, Neal Kime, John Sharpe, and Ray Buzalsky on behalf of TxDOT; Ron Gillihan, Jeff Hannon, Luke Miller, and Ed Parks on behalf of Mid-South; and Russell Baldwin and Brady Gage on behalf of J.L. Steel, a Mid-South subcontractor. Work began on the contract three days later on January 25, 1999. TxDOT accepted the project as complete on January 29, 2001, and imposed $216,000 in liquidated damages.

*Administrative proceedings and judicial review*

Following TxDOT's acceptance of the project, Mid-South initiated administrative proceedings under section 201.112 of the Texas Transportation Code for additional compensation in the amount of $2,570,654.76, including a refund of the liquidated damages assessed by TxDOT. *See* Tex. Transp. Code Ann. § 201.112 (allowing for administrative resolution of claims against TxDOT); *Texas Dep't of Transp. v. Jones Bros. Dirt & Paving Contractors, Inc.*, 92 S.W.3d 477, 484 (Tex. 2002) (statutory procedure under section 201.112 is exclusive remedy for contract disputes between TxDOT and private parties). Mid-South presented fourteen claims for additional compensation and also sought recovery of attorney's fees, costs, and interest.

After TxDOT denied Mid-South's claims, Mid-South requested a contested case hearing before an ALJ. *See* Tex. Transp. Code Ann. § 201.112(b). The case was referred to SOAH for a hearing. A three-day hearing was held in February 2005, and the parties presented live testimony from eleven witnesses. In addition, the parties filed almost seventy exhibits, including deposition testimony from additional witnesses. After the close of the hearing and evidentiary record, the ALJ prepared a PFD recommending that all or part of seven of Mid-South's claims be granted in the amount of $1,097,885.70. The ALJ also recommended that Mid-South recover

3

attorney's fees in the amount of $102,680.59, and interest. The total recommended recovery was $1,200,566.29, plus interest.

Upon review and consideration of the PFD, TxDOT's executive director concluded that all or part of six of Mid-South's claims should be granted in the amount of $605,135.96. The executive director also concluded that Mid-South's claims for attorney's fees and interest should be denied. TxDOT made a final payment of $605,135.96 to Mid-South on December 23, 2005.

Mid-South sought judicial review of the final order in district court. *See* Tex. Transp. Code Ann. § 201.112(d). Finding that the executive director erred in failing to comply with section 2001.058(e) of the Administrative Procedure Act and in denying Mid-South's recovery of attorney's fees as allowed under chapter 2251 of the government code, the district court reversed the final order and remanded the cause to TxDOT for further proceedings. This appeal followed.

***Mid-South's claims for additional compensation***

On appeal, the parties join issue on three of the claims for additional compensation urged by Mid-South below, as well as Mid-South's request for attorney's fees and interest. With respect to each of these claims, Mid-South challenges the executive director's changes to the ALJ's proposed findings of fact and conclusions of law. Accordingly, a description of the disputed claims and the related changes made by the executive director follows.

1.      *Reduced lane closures/Operational delays*

Mid-South sought additional compensation of $1,380,583.81 for work delays caused by TxDOT's refusal to allow overnight lane closures. The ALJ recommended approval of this claim

4

in the amount of $610,743. Upon review, the executive director reduced Mid-South's recovery on this claim to $359,262.

From the outset, the parties disputed whether the contract allowed overnight lane closures. The record reflects that the issue of overnight lane closures was raised and discussed by the parties several times during the preconstruction meeting but was never resolved. The ALJ found that four provisions in the contract would have led Mid-South to believe that overnight lane closures would be permitted:

- Items 1 thru 6 shall be accomplished with no more than one lane closure, 4 kilometers in total length in place on each of the eastbound and westbound lanes at the same time.

- The area of exposed fabric shall at no time exceed the area which may be covered in two days' hot mix asphalt laying operation. The initial area of fabric coverage will be determined by the engineer and thereafter will be determined by the area covered by hot mix asphalt on the two preceding days of laying operations.

- It is the intent of these plans that exposed fabric alone shall not be open to thru traffic.

- All pavement repair in ramps, ramp acceleration lanes shall be made in daylight hours so that such lanes shall be restored and remain unobstructed for travel at night.

Mid-South's owner, Ronald Gillihan, testified that overnight lane closures were "very common" in highway construction projects and that he considered that as a factor when deciding whether to bid on a particular job, including this one. Gillihan further testified that if TxDOT intended to preclude overnight lane closures, that type of restriction would normally be included in the plans. With regard to the contract provisions quoted above, Gillihan testified that he understood the language in the first provision to allow one lane closure in each of the two eastbound lanes and

5

each of the two westbound lanes as long as the lane closures did not impede the traffic. Gillihan testified that he understood the language in the second and third provisions to allow overnight lane closures. According to Gillihan, the language in these provisions would allow Mid-South to lay enough Petromat in one day that it could cover with asphalt in two days but that Mid-South would have to prevent traffic from driving on the exposed Petromat surface, which would require an overnight lane closure. Gillihan also testified that he understood the fourth provision to mean that Mid-South could not have overnight closures of ramps and acceleration lanes, but that overnight closures of the driving lanes were not otherwise prohibited.

When Mid-South was ready to begin the asphalt milling and paving operations on the driving lanes, the record reflects that TxDOT refused to authorize overnight lane closures. As a result of TxDOT's refusal to permit overnight lane closures, Mid-South was required to spend an additional two to three hours per day to set up traffic control and equipment. This resulted in a loss of efficiency in Mid-South's ability to perform the contract, and Mid-South faced the prospect of incurring liquidated damages as a result of the delays.

When questioned about its refusal to permit overnight lane closures, the evidence shows that TxDOT gave two conflicting answers. First, TxDOT claimed that Mid-South had lost its contractual right to have overnight lane closures because of poor safety practices. Two TxDOT witnesses, Stucker and Bodiford, testified about Mid-South's poor safety performance. Stucker testified that he would rate Mid-South's performance on safety at a one out of ten, with one being the lowest score, because Mid-South ignored his instructions on safety matters on multiple occasions. Bodiford testified that Mid-South "was creating an undue burden on the traveling public." The second reason given by TxDOT for its refusal to allow overnight lane closures was that

it never intended to allow them in the first instance. Stucker testified, "Well, it was our intent that this—that the plans weren't set up for—or they weren't—you know the overnight closures weren't intended." Another TxDOT witness, Robert Julian, testified that "the intent was not to have any planned overnight lane closures." Julian further testified that if Mid-South planned to have overnight lane closures Mid-South "should have [had] enough foresight . . . to call and ask if that's going to be acceptable," even though he agreed that nothing in the plain language of the contract prohibited overnight lane closures.

Applying the "gross error standard"[4] to Mid-South's claim, the ALJ determined that TxDOT committed error based on its failure to "extend[ ] the length of the project to accommodate the change in work conditions" and the referee's[5] "failure to exercise honest judgment." Based on these determinations, the ALJ recommended granting Mid-South's claim in the amount of $610,743. Upon review of the PFD, the executive director reduced Mid-South's recovery on this claim to $359,262.

The difference between the amount recommended by the ALJ and the amount

---

[4] The gross error standard applies when the parties to a contract agree to be bound by the decision of a referee. *Texas Dep't of Transp. v. Jones Bros. Dirt & Paving Contractors, Inc.*, 92 S.W.3d 477, 480 (Tex. 2002). Under this standard, a referee's decision is final and conclusive "unless in making it [the referee] is guilty of fraud, misconduct, or such gross mistake as would imply bad faith or failure to exercise honest judgment." *City of San Antonio v. McKenzie Constr. Co.*, 150 S.W.2d 989, 996 (Tex. 1941).

Item 5.2 of the contract between TxDOT and Mid-South states, "The Engineer will act as referee in all questions arising under the terms of the contract between the parties thereto and his decision shall be final and binding." We conclude that the plain language of section 5.2 supports application of the gross error standard to Mid-South's claims. *See Jones Bros.*, 92 S.W.3d at 480. Mid-South does not challenge application of the gross error standard on appeal.

[5] Under the terms of the contract, TxDOT Area Engineer Jimmey Bodiford served as referee.

ultimately awarded by the executive director stems from the different loss of efficiency factors applied by the ALJ and the executive director for Mid-South's role in creating delays. In reaching his recommendation of $610,743, the ALJ relied on the expert testimony of Charles Odom, who testified on behalf of Mid-South that Mid-South's efficiency should be reduced by a factor of 15%. In contrast, the executive director determined that Mid-South's efficiency should be reduced by a factor of 50% because Mid-South "was also responsible for the delay."[6] Based on this determination, the executive director made changes to findings of fact 92 and 96. The executive director provided the following explanation for these changes:

> While the ALJ recommended a discount factor of 15% as proposed by Mid-South's witness Mr. Odom, a factor of 50% is more appropriate. Mr. Odom's determination that Mid-South was 15% responsible was a figure that Mr. Odom testified "just popped out." His testimony is an admission that Mid-South was also responsible for the delay. The estimation should be increased to 50% because Mid-South participated in the pre-construction meeting but did not effectively communicate concerning whether overnight lane closures were allowed. Mid-South's Mr. Gillihan received a copy of the minutes of the meeting (showing the issue unresolved) but he did not read them. Mid-South never contacted TxDOT for clarification of the contract.[7]

(Citations omitted.)

---

[6] Although Charles Shook testified on behalf of TxDOT regarding the delays associated with TxDOT's refusal to allow overnight lane closures, he did not apply a 50% reduction to Mid-South's efficiency. There was no evidence in the record that Mid-South's efficiency should be reduced by a factor of 50%.

[7] The executive director provided this explanation in finding of fact 92 of the final order, but did not provide a separate explanation for the change to finding of fact 96. We note that finding of fact 96 is simply the mathematical calculation of the amount to be awarded Mid-South when applying the 50% loss of efficiency factor.

2.      *Microsurfacing*

Under the original work schedule, the microsurfacing was to be completed after the full-depth concrete repairs, but prior to the asphalt paving. As a result of delays associated with multiple change orders regarding the concrete repairs, Mid-South was compelled to shift the microsurfacing out of sequence. Because the concrete repairs were not completed until December of 1999, the cold-weather conditions prevented Mid-South from completing the microsurfacing until the following spring.[8]

The record shows that Mid-South subcontracted the application of microsurfacing to Cox Paving. After Cox Paving completed the microsurfacing, TxDOT began to notice several problems with the paved surface. Both the ALJ and the executive director determined that the principal cause of the microsurfacing failure was the installation of multiple layers of microsurfacing. Mid-South and TxDOT discussed various options for correcting the problems with the microsurfacing, and Mid-South ultimately agreed to pay another subcontractor to remove the defective microsurfacing. Mid-South then sought additional compensation for the microsurfacing work as part of its administrative claims.

The technical challenge faced by Cox Paving was to install the microsurfacing so as to create a smooth transition from the paved surfaces to the bridge surfaces. As the ALJ explained, this challenge was made more difficult because the approaches to the bridge were uneven. Although the evidence showed that TxDOT considered milling the approaches to create a more uniform

---

[8] Since microsurfacing is a liquid asphalt, TxDOT imposes a temperature requirement that prohibits putting down microsurfacing in colder weather.

surface on which the two pavement surfaces could tie smoothly together, TxDOT rejected this technique.

David Laumer, the supervisor for Cox Paving, testified that Keith Stucker, a TxDOT inspector, contacted him directly[9] and asked if it was possible to raise the level of the microsurfacing to better match the level of asphalt on the bridge deck. Laumer responded that the only way to do this was to apply two layers of microsurfacing. Laumer testified that Stucker instructed him to install two layers of microsurfacing on all the bridges. Stucker testified that he did not instruct Cox Paving to install two layers of microsurfacing.

The ALJ recommended that Mid-South's claim for additional compensation be paid on the basis that TxDOT had interfered with Mid-South's management of the work on the contract.[10] The ALJ also recommended that TxDOT add 82 days to the contract period resulting in the return of an additional $82,000 in liquidated damages to Mid-South. The executive director rejected this recommendation on the basis of Stucker's testimony that he did not instruct Cox Paving to install two layers of microsurfacing. Based on his determination that Stucker did not instruct Cox Paving to apply two layers of microsurfacing, the executive director made changes to findings of fact 167, 170, 172, and 175. The executive director explained the rationale for these changes in finding of fact 167 of the final order:

[9] The ALJ found this direct contact to be one of several instances of TxDOT's direct negotiations and interference with a Mid-South subcontractor.

[10] The ALJ recommended payment in the amount of $159,269, which included "the amount of Cox [Paving]'s invoice, less the amount paid by TxDOT for part of the work, plus the amount of Dustrol's invoice for the milling [and removal of the microsurfacing], plus some equipment and supply costs."

While the ALJ concluded that Mr. Stucker (a TxDOT employee) instructed Cox to install two lifts of microsurfacing, the preponderance of the evidence does not support that conclusion. The deposition of the supervisor for Cox Paving, David Laumer, showed that when discussing the uneven level of the two surfaces, he suggested to Mr. Stucker that the problem could be solved by applying two lifts of microsurface. Mid-South Exhibit No. 22, p.4, lines 8-10. The next succeeding finding of fact shows Mr. Laumer's proposed solution turned out to be the cause for the future failure of the microsurfacing. His deposition also shows that, according to Mr. Laumer, Mr. Stucker "directed" Mr. Laumer to apply two lifts of microsurface. His deposition was taken in February 2005. In contrast, earlier in time (during the surfacing of the first bridge), Mr. Laumer described to Marion [Ed] Parks the same communications Mr. Laumer had with Mr. Stucker. At that time, as Mr. Parks recalled the conversation, Mr. Laumer only said that he had "got together" with Mr. Stucker on "it." It is not clear whether "it" was a discussion of the problem, or of any proposed solution to the problem. Tr. 384, lines 6-25. Mr. Stucker's testimony showed he did not instruct Mr. Laumer to apply two lifts of microsurface. Tr. 1071, lines 10-20. When the decision was made to apply two lifts of microsurface, contemporaneous meeting minutes and correspondence also show that Cox Paving made the decision. TxDOT Exhibit No. P1B (attachment F).

The executive director also made a corresponding change to conclusion of law 9, which deleted the reference in that conclusion to Mid-South's microsurfacing claim.

### 3. *Return of liquidated damages*

As a result of his decision to reject Mid-South's claim related to microsurfacing, the executive director made the following related changes to findings of fact 195 and 196 regarding liquidated damages:[11]

195. Because Claim No. 12, relating to microsurfacing, was [dis]approved, and the parties do not dispute that TxDOT charged 82 days to the contract while this issue was being resolved, Mid-South is [not] entitled to an 82-day extension on this part of the claim.

---

[11] The executive director also made a corresponding change to conclusion of law 11.

11

196.    Mid-South is entitled to a total extension of ~~109~~ [27] days, translating into a reduction in liquidated damages of ~~$109,000~~ [$27,000].[12]

4.      *Attorney's fees and interest*

Because the executive director denied Mid-South's claims under the Prompt Payment Act for attorney's fees and interest, the executive director made changes to findings of fact 197 and 198 to reflect this denial. The executive director also made corresponding changes to conclusions of law 12 and 13. To the extent the executive director provided an explanation for these changes, that explanation appears in the final order at conclusion of law 12 as follows:

> The case concerns the adjudication of Mid-South's contract claims under Tex. Transp. Code § 201.112, which does not authorize the payment of interest or attorney's fees. A contract claim and a Prompt Payment Act claim are two different questions. *Alamo Community College District v. Browning Construction Co.*, 131 S.W.3d 146, 167 (Tex. App.—San Antonio 2004, pet. filed).[13] Here there was a bona fide dispute between Mid-South and TxDOT and therefore the Prompt Payment Act did not apply. Tex. Gov't Code ch. 2251.

**DISCUSSION**

In five issues TxDOT complains the trial court erred in its reversal of the final order. Specifically, TxDOT argues that the trial court incorrectly required the executive director to meet the requirements in government code section 2001.058 when changing the ALJ's proposed findings of fact and conclusions of law. TxDOT further argues it has sovereign immunity from Mid-South's

---

[12] Language added by the executive director appears in brackets [ ], and language deleted by the executive director appears in strike out.

[13] The supreme court dismissed the petition for review pursuant to settlement on April 28, 2006.

claims for attorney's fees and interest; substantial evidence supports the executive director's findings, conclusions and decisions regarding operational delays, microsurfacing and return of liquidated damages; and there was no error in the executive director's deletion of findings of fact and conclusions of law that did not affect the final decision.

Mid-South responds that the trial court correctly applied section 2001.058; the executive director improperly changed the ALJ's findings of fact and conclusions of law; the doctrine of sovereign immunity is not implicated with respect to Mid-South's claims for attorney's fees and interest; and there is no evidence to support the executive director's reduction to Mid-South's efficiency factor. On cross-appeal, Mid-South contends the trial court erred in denying its claim for interest. Mid-South claims it was entitled to recover interest because the evidence shows there was not a bona fide dispute between Mid-South and TxDOT.

***Standard of review***

We review TxDOT's final order under the substantial evidence rule. *See* Tex. Transp. Code Ann. § 201.112(d); Tex. Gov't Code Ann. § 2001.174 (West 2000). "Broadly speaking, the substantial evidence rule is a court review device to keep the courts out of the business of administering regulatory statutes enacted by the Legislature; but it remains the business of the courts to see that justice is administered to competing parties by governmental agencies." *Lewis v. Metro. Sav. & Loan Ass'n*, 550 S.W.2d 11, 13 (Tex. 1977). Under a substantial-evidence review, we presume that the agency's order is supported by substantial evidence, and the appellant has the burden of overcoming this presumption. *Graff Chevrolet Co., Inc. v. Texas Motor Vehicle Bd.*, 60 S.W.3d 154, 159 (Tex. App.—Austin 2001, pet. denied). When a court is applying the

substantial-evidence standard of review to an agency decision, the issue for the reviewing court is not whether the agency's decision was correct, but whether the record demonstrates some reasonable basis for the agency's action. *Central Power & Light Co. v. Public Util. Comm'n*, 36 S.W.3d 547, 561 (Tex. App.—Austin 2000, pet. denied). We may not substitute our judgment for that of the agency on matters committed to agency discretion. Tex. Gov't Code Ann. § 2001.174; *H.G. Sledge, Inc. v. Prospective Inv. & Trading Co., Ltd.*, 36 S.W.3d 597, 602 (Tex. App.—Austin 2000, pet. denied). We will reverse the agency's order if the decision is not reasonably supported by substantial evidence, is arbitrary or capricious, or is characterized by an abuse of discretion. *See* Tex. Gov't Code Ann. § 2001.174(2)(E), (F).

### TxDOT's claims

1.      *Tex. Transp. Code Ann. § 201.112 v. Tex. Gov't Code Ann. § 2001.058(e)*

In its first issue, TxDOT argues the trial court erred in requiring the executive director to meet the standards in section 2001.058(e) of the government code when changing the ALJ's findings of fact and conclusions of law. Specifically, TxDOT contends the executive director need only satisfy the requirements in section 201.112 of the transportation code when making changes to the PFD. Because he did so in this case, TxDOT maintains the trial court erred in reversing the final order. Mid-South responds that the Administrative Procedure Act (APA) provides minimum standards for all state agencies and that nothing in section 201.112 expressly supersedes the application of section 2001.058. In support of these arguments, Mid-South relies on this Court's opinion in *Flores v. Employees Retirement System*, 74 S.W.3d 532 (Tex. App.—Austin 2002, pet. denied).

14

While section 2001.058 provides the general rule that guides an agency's discretion when making changes to an ALJ's findings of fact or conclusions of law, we agree with TxDOT that section 2001.058 does not apply in this case. The plain language of section 201.112(c) specifies that section 201.112(c) of the transportation code, not section 2001.058 of the government code, governs the executive director's discretion to make changes in a PFD. Section 201.112(c) states:

> An administrative law judge's proposal for decision rendered under chapter 2001, Government Code, shall be submitted to the director for adoption. *Notwithstanding any law to the contrary*, the director may change a finding of fact or conclusion of law made by the administrative law judge or may vacate or modify an order issued by the administrative law judge. The director shall provide a written statement containing the reason and legal basis for a change made under this subsection.

Tex. Transp. Code Ann. § 201.112(c) (emphasis added). The phrase "[n]otwithstanding any law to the contrary" makes clear the legislature's intent that section 201.112(c) supersede other Texas law regarding an agency's ability to change findings of fact or conclusions of law, including section 2001.058 of the APA. *See, e.g.*, *Southwestern Pub. Serv. Co. v. Public Util. Comm'n*, 962 S.W.2d 207, 212-13 (Tex. App.—Austin 1998, pet. denied) ("*SWEPCO*") (finding similar language in section 2003.049(g) of the government code expressly supersedes APA section 2001.058). Rather than imposing the general restrictive APA section 2001.058 on TxDOT proceedings heard by SOAH under section 201.112, the legislature has crafted a specific provision for such proceedings. Accordingly, we conclude the trial court erred in applying section 2001.058 and requiring the executive director to satisfy the provisions of that statute when making changes to the PFD. We sustain TxDOT's first issue on appeal.

15

## 2. *Compliance with section 201.112*

Sustaining TxDOT's claim that the trial court erred in its application of section 2001.058 does not end our inquiry. We must still determine whether the executive director's changes to the PFD satisfy the standards in section 201.112(c). Mid-South argues the executive director failed to comply with section 201.112 and his changes to the ALJ's findings of fact and conclusions of law were arbitrary and capricious and, therefore, the final order should be reversed. TxDOT responds, "There are no limitations imposed on the executive director's power to change a finding of fact or conclusion of law." Because we conclude the executive director acted arbitrarily and capriciously and failed to comply with section 201.112 when making changes to the ALJ's findings of fact and conclusions of law, we affirm the trial court's judgment reversing the final order.

The executive director's authority to change a finding of fact or conclusion of law is not without limits. While section 201.112(c) allows the executive director to make changes to a PFD, the executive director must provide a written statement containing the reason and legal basis for any changes made. *See* Tex. Transp. Code Ann. § 201.112(c). The executive director's final order must be supported by substantial evidence considering the reliable and probative evidence in the record as a whole. *See id.* § 201.112(d) (final order subject to review under the APA); Tex. Gov't Code Ann. § 2001.174. It must comport with the executive director's statutory authority and be free of constitutional, statutory, procedural, or other legal error, and it may not be arbitrary or capricious or otherwise characterized by an abuse of discretion. *See* Tex. Gov't Code Ann. § 2001.174.

The executive director's changes to particular findings and conclusions suggest that

16

the executive director was acting as TxDOT's own factfinder despite the legislature having delegated that duty to the ALJ in section 201.112(b). *See Montgomery Indep. Sch. Dist. v. Davis*, 34 S.W.3d 559, 564 (Tex. 2000) ("Having chosen to delegate the fact-finding role to the hearing examiner, a board cannot then ignore those findings with which it disagrees and substitute its own additional findings."). The record reflects that certain changes made by the executive director are not supported by substantial evidence and, in some instances, the executive director failed to comply with the requirement to provide a written statement containing the reason and legal basis for changing the ALJ's findings of fact and conclusions of law. *See* Tex. Transp. Code Ann. § 201.112(c); 43 Tex. Admin. Code § 9.2(g)(4) (West 2007). These aspects of the executive director's decision raise serious due process concerns.

While this Court has previously recognized that an administrative agency is not subject to the same rules and restrictions as a court of law, an agency must respect the due process rights of those persons who appear before it in contested cases. *See Flores*, 74 S.W.3d at 539 (citing *Texas State Bd. of Pharmacy v. Seely*, 764 S.W.2d 806, 815 (Tex. App.—Austin 1988, writ denied); *Madden v. Texas Bd. of Chiropractic Exam'rs*, 663 S.W.2d 622, 625-27 (Tex. App.—Austin 1983, writ ref'd n.r.e.)). Section 201.112 contemplates that when a contractor is dissatisfied with TxDOT's informal resolution of his claims, the contractor may request a formal administrative hearing to resolve those claims under Chapter 2001 of the government code. *See* Tex. Transp. Code Ann. § 201.112(b); Tex. Gov't Code Ann. § 2001.051 (West 2000) (providing opportunity for contested case hearing). Under the statute and TxDOT's rules, this hearing is delegated to an ALJ at SOAH. *See* Tex. Transp. Code Ann. § 201.112(b)-(c); 43 Tex. Admin. Code §§ 1.21-.33 (procedures in

17

contested cases), 9.2(g)(3)(D)(ii) (request for contested case hearing) (West 2007).  The purpose of such a hearing is to give the litigants an opportunity to present evidence. Any conflicts in the evidence are resolved by the decision-maker by weighing the evidence and evaluating the credibility of witnesses.  *See* F. Scott McCown, *When Can an Agency Change the Findings or Conclusions of an Administrative Law Judge?* 50 Baylor L. Rev. 65, 74 (1998).  The resolution of disputed facts requires weighing the evidence and making credibility determinations.  *Id.*  Accordingly, a neutral decision-maker is crucial to a fair adjudicatory hearing.  2 Kenneth Culp Davis & Richard J. Pierce, Jr., *Administrative Law Treatise* § 9.8 at 67 (3d ed. 1994).  Because the ALJ has heard the evidence and observed the demeanor of the witnesses, the ALJ is in a superior position than an agency head or board reviewing the proposed decision.  *Id.*

By permitting a contractor dissatisfied with TxDOT's informal resolution of a claim under section 201.112 to request a formal administrative hearing, the legislature has recognized the importance of a neutral decision-maker.  *See* Tex. Transp. Code Ann. § 201.112(b).  In addition, the legislature has cabined the executive director's discretion to make changes to the ALJ's proposed decision by requiring the executive director to provide a written statement of the reason and legal basis for each change.  *Id.* § 201.112(c).  The supreme court recognized the importance of this limitation in *Montgomery Independent School District v. Davis*:

> If a board could find additional facts, resolving conflicts in the evidence and credibility disputes, it would then be serving as its own factfinder despite delegating the factfinding role to a hearing examiner, and the process of using an independent factfinder would be meaningless.  An independent factfinder is integral to the structure of the hearing-examiner process; permitting a school board to select an independent factfinder avoids having the board, a party to the dispute, act as its own factfinder when reviewing the employment decision of its own administration.  The

18

> Legislature has further protected the independent nature of the hearing-examiner process by requiring the board to state in writing the reason, including the legal basis for any change or rejection it makes under section 21.5259 [of the education code].

34 S.W.3d 559, 564 (Tex. 2000). Because of the seriousness of the issues raised by the executive director's treatment of Mid-South's claims, we discuss each of the director's changes to the ALJ's proposed findings of fact and conclusions of law.

### A. Reduced lane closures/Operational delays

With respect to Mid-South's request for additional compensation on this claim, the ALJ recommended awarding Mid-South $610,743. In the final order, however, the executive director awarded Mid-South $310,262 on this claim. The primary difference between the amount proposed by the ALJ and the amount awarded by the executive director results from the executive director's application of a 50% reduction to Mid-South's efficiency. The executive director explained that he applied a 50% reduction to Mid-South's efficiency because Mid-South "was also responsible for the delay" and that "Mid-South never contacted TxDOT for clarification of the contract." We conclude, however, that the executive director's explanation for his changes to findings of fact 92 and 96, and the related change to conclusion of law number 11, is not supported by substantial evidence.

The record reflects that Mid-South presented testimony from three witnesses—Charles Odom, Dr. John Borcherding, and Dr. Calin Popescu—regarding the delays that resulted from TxDOT's initial refusal to permit overnight lane closures. Odom testified that based on his experience and training he reduced Mid-South's efficiency by 15%. Although TxDOT

19

presented the testimony of Charles Shook on this issue, the record reflects that Shook did not recommend a reduction to Mid-South's efficiency, but instead presented an entirely different calculation of the amount that Mid-South should recover on this claim. This Court has previously held that an agency decision that falls within the range of relevant evidence in the record is supported by substantial evidence. *See Central Power & Light Co. v. Public Util. Comm'n*, 36 S.W.3d 547, 559 (Tex. App.—Austin 2000, pet. denied). The only evidence in the record regarding a reduction to Mid-South's efficiency was the 15% figure presented by Odom. There is nothing in the record to support the executive director's determination that Mid-South's efficiency should be reduced by a factor of 50%. While it may be true that Mid-South was also responsible for some of the delay, without more, this fact alone does not translate into a 50% reduction to Mid-South's efficiency. Therefore, we conclude that findings of fact 92 and 96 (and conclusion of law number 11) are not supported by substantial evidence. Accordingly, we affirm the district court's reversal of the final order and remand for further proceedings on the issue of operational delays.

### B. Microsurfacing

The executive director also made changes to the ALJ's proposed decision regarding those claims related to microsurfacing. The ALJ recommended granting Mid-South's microsurfacing claim in the amount of $159,269. But, in the final order, the executive director denied this claim altogether, making changes to findings of fact 167, 170, 172, and 175 and conclusion of law 11. Both the ALJ and the executive director based their decisions on the testimony of David Laumer, a supervisor for Cox Paving, and Keith Stucker, a TxDOT employee. The explanation given by the executive director in finding of fact 167 reflects that the executive director

also relied on the testimony of Marion Edward "Ed" Parks, a Mid-South employee, and TxDOT Exhibit No. P1B (Attachment F).[14]

The record reflects that Laumer and Stucker gave conflicting testimony with Laumer stating that Stucker instructed him to apply two layers of microsurfacing and Stucker claiming that he did not instruct Laumer to apply two layers of microsurfacing. Parks's testimony reflects that Laumer got together with Stucker on "it." In his explanation for the changes to the ALJ's findings, the executive director acknowledges that Parks's testimony "is not clear whether 'it' was a discussion of the problem, or of any proposed solution to the problem." Thus, Parks's testimony fails to resolve the direct conflict between the testimony of Laumer and Stucker. The executive director's explanation shows that he attempted to resolve this conflict by relying on Attachment F in TxDOT Exhibit No. P1B. Referring to a letter from Mid-South to Cox Paving on August 11, 2000, Attachment F contains the following excerpt:

> On June 8, 2000 when David Laumer met with Midsouth Pavers Ed Parks, he was shown the bridge deck and approaches. He told Mr. Parks that microsurfacing would be able to correct any deficiencies. He never told Our Project Superintendent that there was a danger of rutting or loss of texturing. *In fact, David Laumer told Ed Parks that he had already showed Keith Stucker, chief Inspector for TxDOT, what he planned on doing and had Keith's blessing.* If this job could be built as directed by the plans and specifications, your representative had the duty to notify Midsouth Pavers before any work began.

* * *

---

[14] TxDOT Exhibit No. P1B, also referred to by the parties as "the Bohuslav report," was a document prepared by TxDOT for the purpose of settlement negotiations with Mid-South. Under TxDOT rules, this report is not admissible for any purpose, and TxDOT objected to its admissibility in the hearing before SOAH. *See* 43 Tex. Admin. Code § 9.2(b)(3)(C) (West 2007). We observe, however, that the executive director relied on this report in the final order.

21

Keith Stucker, chief Inspector notified Midsouth Pavers after the first bridge deck was completed, Sanchez Creek, that Cox Paving takeoff header was unacceptable. When Ed Parks and Larry Brown pointed out high spot to David Laumer, he said Keith Stucker had already made him aware of the bump they had left. Ed Parks offered David Laumer the use of straightedge, he declined, stating that he could fix the problem. Once again, Midsouth Pavers was not informed of any potential problems that could result from your effort to correct your problem . . . .

(Emphasis added.) The ALJ stated that he gave no weight to the Bohuslav report, but the executive director relied on this excerpt from Attachment F in support of his determination that Cox Paving, not TxDOT, made the decision to apply two layers of microsurfacing. This excerpt does not conclusively identify who made the decision or gave approval to apply two layers of microsurfacing. The italicized statement merely demonstrates that Laumer "planned" to do something—presumably to apply two layers of microsurfacing—and that Stucker gave his "blessing" to this plan. Thus, we are still confronted with the conflict between the testimony of Laumer and Stucker.

This Court considered a similar situation in which an agency reversed a hearings examiner's findings based on credibility in *Texas State Board of Medical Examiners v. Birenbaum*, 891 S.W.2d 333 (Tex. App.—Austin 1995, writ denied). In that case, the hearings examiner discounted the testimony of two witnesses because she questioned their credibility. *Id.* at 337. The Board's final order showed that the Board clearly found both witnesses to be credible. *Id.* Recognizing the substantial evidence standard of review, we concluded it was unnecessary to address this apparent discrepancy in the findings between the hearings examiner and the Board because there was independent evidence in the record to support the Board's decision. *Id.* at 338.

In the record before us, there is no other evidence that conclusively resolves the credibility conflict between Laumer and Stucker, and we must now consider the question we left

22

unanswered in *Birenbaum*. Like the situation we addressed in *Birenbaum*, the ALJ, a neutral disinterested decision-maker who heard the testimony and observed the demeanor of the witnesses, resolved the credibility conflict in favor of Mid-South, whereas the executive director, the administrative head of an interested party who reviewed the PFD, resolved the same conflict in favor of TxDOT. On this record, there is a clear question of witness credibility, which was resolved by the ALJ one way and by the executive director in a completely different way. By resolving conflicts and credibility issues in disputed evidence, the executive director has essentially stepped into the shoes of the factfinder and reweighed the evidence to reach a specific result. This is not what the legislature envisioned in section 201.112.

In that section, the legislature allowed TxDOT to establish by rule an informal procedure to resolve certain contract claims. *See* Tex. Transp. Code Ann. § 201.112(a). If a person was dissatisfied with TxDOT's informal resolution, the legislature allowed that person to request a formal administrative hearing pursuant to Chapter 2001 of the government code—*i.e.*, the APA. *Id.* § 201.112(b). The legislature has also required the executive director to provide a written statement of the reason and legal basis for any change the executive director makes to the ALJ's proposed decision. *Id.* § 201.112(c). By allowing a person to request a formal administrative hearing, the legislature has delegated the factfinding role to the ALJ, not to the executive director. Having delegated this factfinding role to the ALJ, the legislature in section 201.112 did not permit the executive director to disregard those findings with which he disagrees and substitute his own findings. *See Davis*, 34 S.W.3d at 564. By requiring the executive director to provide a written statement of the reason and legal basis for any changes to the ALJ's proposal, the legislature has

23

safeguarded the independent nature of the administrative hearing process. *See id.*; *Flores*, 74 S.W.3d at 540. The executive director's decision on the microsurfacing issue is at odds with these fundamental administrative law principles.

The supreme court has made clear that an agency's final order may be supported by substantial evidence and yet be invalid for arbitrariness. *Texas Health Facilities Comm'n v. Charter Med.–Dallas, Inc.*, 665 S.W.2d 446, 454 (Tex. 1984); *Lewis*, 550 S.W.2d at 13-14; *Starr County v. Starr Indus. Servs., Inc.*, 584 S.W.2d 352, 355-56 (Tex. Civ. App.—Austin 1979, writ ref'd n.r.e.); *compare* Tex. Gov't Code Ann. § 2001.174(2)(E) *with id.* § 2001.174(2)(F). "[A]rbitrary action of an administrative agency cannot stand." *Lewis*, 550 S.W.2d at 16. An administrative agency acts in an arbitrary manner when the treatment accorded to parties in the administrative process denies them due process of law. *Id.* At a minimum, due process requires that an agency's decision comport with the authority granted to the agency under its own statute and rules. *Id.* at 13 (agency proceedings must satisfy due process). In deciding whether the executive director acted arbitrarily and capriciously, we must determine whether the final order was based on a consideration of all relevant factors and whether there is a rational connection between the facts and the decision of the executive director. *See Starr County*, 584 S.W.2d at 355-56. We may not substitute our judgment for that of the agency. *Id.*

The executive director's explanation for the changes made to findings of fact 167, 170, 172 and 175 demonstrates that the executive director abused his discretion in making these changes and that his decision was arbitrary and capricious. Although section 201.112 gives the executive director broad discretion to make changes to the ALJ's proposed findings of fact and

24

conclusions of law, the executive director may not ignore the evidence. *See* Tex. Gov't Code Ann. § 2001.174. Given the ambiguities in the testimony of Ed Parks and TxDOT Exhibit No. P1B, the executive director's explanation shows that he simply chose to believe Stucker, a TxDOT employee, over Laumer, a third-party subcontractor.[15] We have found no other independent evidence in the record to support the executive director's determination that Stucker did not instruct Cox paving to apply two layers of microsurfacing. The executive director's explanation thus gives the appearance of being arbitrary and capricious because the executive director did not hear the testimony or evaluate the witnesses' demeanor, and yet he chose to resolve the conflict in testimony and credibility in favor of TxDOT, irrespective of the facts as determined by the ALJ.

On this record, we conclude that the executive director's decision was arbitrary and capricious. There is no rational connection between the facts as supported by the evidence and the executive director's decision. We are unpersuaded by TxDOT's argument that section 201.112 allows the executive director to reweigh the evidence and substitute his own credibility determinations in place of those made by the ALJ. *See Davis*, 34 S.W.3d at 564; *Flores*, 74 S.W.3d at 540-41. This is not to say that the ALJ's credibility determinations are always immune from change under section 201.112. *See, e.g.*, *SWEPCO*, 962 S.W.2d at 214 (section 2003.049(g) of the government code allows the public utility commission to reevaluate the evidence admitted at a SOAH hearing to determine if the ALJ's findings are supported by a preponderance of evidence); *Birenbaum*, 891 S.W.2d at 338 (board may change credibility findings where change is supported

---

[15] That the executive director chose to believe Stucker, a TxDOT employee, over Laumer, a third-party subcontractor, is underscored by TxDOT's challenge below to the admissibility of Exhibit No. P1B—a challenge they do not bring forth on appeal.

by independent record evidence). But on this record, where the ALJ, and not the executive director, heard the testimony and observed the demeanor of the witnesses, and in the absence of independent evidence in the record to support the executive director's credibility choice, we conclude that the executive director's decision to reject the ALJ's findings based on credibility was arbitrary and capricious. Accordingly, we affirm the district court's reversal of the final order and remand for further proceedings on the issue of microsurfacing.

### C.  *Return of liquidated damages*

In light of our conclusion that the executive director's decision on the microsurfacing issue was arbitrary and capricious, we likewise conclude that the executive director's related changes to findings of fact 195 and 196, and the corresponding change to conclusion of law 11, were arbitrary and capricious. We affirm the district court's reversal of the final order and remand for further proceedings on the issue of return of liquidated damages.

### D.  *Changes to other findings*

In its fifth issue on appeal, TxDOT argues that the executive director need not provide a written statement of the reason and legal basis for those changes to findings of fact or conclusions of law "that did not affect the final decision." Because every finding of fact and conclusion of law plays a role in the agency's final decision, it is difficult for us to see how TxDOT can argue that any change by the executive director, other than perhaps a typographical correction, would not affect the final decision in some manner. Moreover, the legislature has expressly required the executive director to provide a written statement containing the reason and legal basis for a change to the ALJ's

26

findings or conclusions. Tex. Transp. Code Ann. § 201.112(c); *see also Levy v. Texas State Bd. of Med. Exam'rs*, 966 S.W.2d 813, 816 (Tex. App.—Austin 1998, no writ) (agency required to "articulate specifically its reasons for each individual change made"); *Employees' Retirement Sys. v. McKillip*, 956 S.W.2d 795, 800 (Tex. App.—Austin 1997, no pet.) (same), *overruled in part on other grounds by Texas Natural Res. Conservation Comm'n v. Sierra Club*, 70 S.W.3d 809, 814 (Tex. 2002).

Our review and comparison of the PFD and the final order show that the executive director deleted findings of fact 121 and 122 without providing the explanation required in section 201.112(c). For this reason, we affirm the district court's reversal of the final order and remand for further proceedings regarding these deleted findings.

By our holding that the executive director must provide a written statement for each individual change to the ALJ's findings or conclusions, we do not mean to prohibit an agency from making corresponding changes to related findings of fact or conclusions of law for the same or similar reasons. Rather, we emphasize that the agency need only explain the rationale for each of its changes. *See Levy*, 966 S.W.2d at 816. We overrule TxDOT's fifth issue.

### 3. *Sovereign immunity*

In its second issue on appeal, TxDOT argues that it has sovereign immunity from Mid-South's claims for attorney's fees and interest. More specifically, TxDOT contends that there is no clear and unambiguous waiver of sovereign immunity for attorney's fees and interest on contract claims against TxDOT. The ALJ recommended approval of Mid-South's claims for attorney's fees and interest, but the executive director denied both claims in the final order. The

district court reversed the final order, awarding attorney's fees, but not interest, to Mid-South.[16] TxDOT seeks reversal of the district court's judgment to the extent it awards attorney's fees to Mid-South. Because we conclude that sovereign immunity has been waived, we affirm the district court's judgment awarding attorney's fees.[17]

Sovereign immunity protects the state from lawsuits for money damages and includes both immunity from suit and immunity from liability. *General Servs. Comm'n v. Little-Tex Insulation Co.*, 39 S.W.3d 591, 594 (Tex. 2001). Immunity from suit bars a suit against the state unless the legislature has expressly consented to the suit. *Id.* If the legislature has not expressly waived immunity from suit, the state retains such immunity even if its liability is undisputed. *Federal Sign v. Texas S. Univ.*, 951 S.W.2d 401, 405 (Tex. 1997). Immunity from liability protects the state from money judgments even if the legislature has consented to suit. *Little-Tex*, 39 S.W.3d at 594.

### A. Immunity from suit

TxDOT argues that it has sovereign immunity from Mid-South's claims for attorney's fees and interest because nothing in the plain language of section 201.112 of the transportation code waives sovereign immunity for those claims. We disagree. Section 201.112 provides that a person may seek resolution of "a claim arising out of a contract." *See* Tex. Transp. Code Ann. § 201.112(a). The supreme court has held that section 201.112 provides the exclusive remedy for contract claims

---

[16] The district court based its award of attorney's fees on section 2251.043 of the Prompt Payment Act. *See generally* Tex. Gov't Code Ann. §§ 2251.001-.055 (West 2000 & Supp. 2007).

[17] We address Mid-South's cross-appeal on the district court's denial of interest below.

against TxDOT.  *See Jones Bros.*, 92 S.W.2d at 484.  Based on this holding, we conclude that section 201.112 waives sovereign immunity from suit for all claims arising out of a contract governed by that section.  *See* Tex. Transp. Code Ann. § 201.112(a)(1)-(5) (describing those contracts subject to section 201.112).

Having concluded that section 201.112 waives immunity from suit for all claims "arising out of a contract," we must determine whether Mid-South's claims for attorney's fees and interest are claims "arising out of a contract" within the meaning of section 201.112.  This question presents a matter of statutory construction.

When construing a statute, our primary goal is to determine and give effect to the legislature's intent.  *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 25 (Tex. 2003).  To determine legislative intent, we look to the statute as a whole, as opposed to isolated provisions.  *State v. Gonzalez*, 82 S.W.3d 322, 327 (Tex. 2002).  We begin with the plain language of the statute at issue and apply its common meaning.  *City of San Antonio*, 111 S.W.3d at 25.  Where the statutory text is unambiguous, we adopt a construction supported by the statute's plain language, unless that construction would lead to an absurd result.  *Fleming Foods of Tex., Inc. v. Rylander*, 6 S.W.3d 278, 284 (Tex. 1999).

The word "arise" means to originate, stem, or result from.  Black's Law Dictionary 102 (7th ed. 1999).  The supreme court has previously construed the phrase "arising out of" in section 101.057(2) of the Texas Tort Claims Act.[18]  *See Delaney v. University of Houston*, 835 S.W.2d 56, 59 (Tex. 1992).  Section 101.057(2) is an exception to the limited waiver of

[18] Tex. Civ. Prac. & Rem. Code Ann. § 101.057(2) (West 2005).

29

immunity under the tort claims act, which provides in relevant part that the Texas Tort Claims Act does not apply to a claim "arising out of assault, battery, false imprisonment or any other intentional tort . . . ." *Id.* at 58. Consistent with its holding in *LeLeaux v. Hamshire-Fannett Independent School District*, 835 S.W.2d 49, 51 (Tex. 1992), in which the supreme court construed the phrase "arises from" in section 101.021 of the tort claims act,[19] the supreme court in *Delaney* held that the phrase "arising out of" requires a certain nexus, or connection, between the claim and the intentional tort. *Delaney*, 835 S.W.2d at 59.

In this case, Mid-South filed an administrative claim under section 201.112 asserting claims for additional compensation under the contract, as well as claims for attorney's fees and interest under the Prompt Payment Act, chapter 2251 of the government code. There can be little doubt that Mid-South's claims for attorney's fees and interest stem or result from the contract. Without the contract and the claims for additional compensation thereunder, Mid-South would have no claims for attorney's fees or interest. Based on the supreme court's holding in *Delaney*, we find a sufficient nexus between Mid-South's claims for attorney's fees and interest and the contract between Mid-South and TxDOT. *See id.* Therefore, we conclude that Mid-South's claims for attorney's fees and interest are claims "arising out of a contract" within the meaning of section 201.112 and that section 201.112 necessarily waives sovereign immunity from suit on those claims.

### B. *Immunity from liability*

We next consider whether immunity from liability has likewise been waived. The

---

[19] Tex. Civ. Prac. & Rem. Code Ann. § 101.021 (West 2005).

30

supreme court has consistently held that the state waives immunity from liability when it contracts with a private party. *Compare* Tex. Transp. Code Ann. § 201.112(e), *with Texas Natural Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 854 (Tex. 2002), *and Little-Tex*, 39 S.W.3d at 594. Texas law is clear, however, that a prevailing party may not recover attorney's fees unless permitted by statute or contract. *See, e.g.*, *Holland v. Wal-Mart Stores, Inc.*, 1 S.W.3d 91, 95 (Tex. 1999); *Travelers Indem. Co. of Conn. v. Mayfield*, 923 S.W.2d 590, 593 (Tex. 1996); *Dallas Cent. Appraisal Dist. v. Seven Inv. Co.*, 835 S.W.2d 75, 77 (Tex. 1992); *First City Bank-Farmers Branch v. Guex*, 677 S.W.2d 25, 30 (Tex. 1984); *New Amsterdam Cas. Co. v. Texas Indus., Inc.*, 414 S.W.2d 914, 915 (Tex. 1967). Neither party argues that the contract provides for the recovery of attorney's fees or interest. TxDOT argues that section 201.112 expressly states that it does not waive sovereign immunity from liability. TxDOT further contends that the Prompt Payment Act does not apply and, even if it did, there is no clear and unambiguous waiver of sovereign immunity from liability in the statute. Mid-South responds that the legislature's inclusion of section 2251.053, *see* Tex. Gov't Code Ann. § 2251.053 (West Supp. 2007), which expressly applies to contracts with TxDOT, demonstrates that the Prompt Payment Act applies in this case. Mid-South also points to section 2251.043, *see id.* § 2251.043 (West 2000), as providing an express waiver of sovereign immunity.

The Prompt Payment Act requires governmental entities, including state agencies like TxDOT, to make timely payments for the purchase of goods and services, including purchases made by contract. *See generally* Tex. Gov't Code Ann. §§ 2251.001-.055; House Comm. on Bus. & Commerce, Bill Analysis, Tex. H.B. 275, 69th Leg., R.S. (1985). By its express terms, government

31

code section 2251.053 "applies only to a contract entered into by [TxDOT] for the construction or maintenance of a highway or related facility." Tex. Gov't Code Ann. § 2251.053(a). We agree with Mid-South that the legislature's inclusion of section 2251.053 makes clear that the Prompt Payment Act, chapter 2251 of the government code, applies to contracts with TxDOT.

Moreover, section 2251.043 provides that in a formal administrative or judicial action to recover a payment or interest due under chapter 2251, "the opposing party, which may be the governmental entity or the vendor, shall pay the reasonable attorney's fees of the prevailing party." *Id.* § 2251.043 (West 2000). By its terms, section 2251.043 requires the opposing party to pay the prevailing party's attorney's fees regardless of whether the opposing party is a governmental entity. *Id.* The plain language of this provision contemplates that a governmental entity like TxDOT may be required to pay reasonable attorney's fees. *Id.* By authorizing such payments, it follows and we conclude the legislature in section 2251.043 has waived sovereign immunity from liability for the award of attorney's fees. *See Texas Educ. Agency v. Leeper*, 893 S.W.2d 432, 446 (Tex. 1994) (by authorizing awards of attorney's fees, the Uniform Declaratory Judgments Act necessarily waives governmental immunity for such awards).[20] We overrule TxDOT's second issue and affirm the district court's judgment that Mid-South is entitled to recover attorney's fees.

4.      *Substantial Evidence*

In its third and fourth issues on appeal, TxDOT claims that the district court erred in

---

[20]      Because the plain language of section 2251.026 of the government code likewise authorizes interest payments by a state agency, we also conclude that the legislature has necessarily waived sovereign immunity from liability for the award of interest. *See* Tex. Gov't Code Ann. § 2251.026 (West Supp. 2007); *Texas Educ. Agency v. Leeper*, 893 S.W.2d 432, 446 (Tex. 1994).

32

reversing the final order because it was supported by substantial evidence. Specifically, TxDOT argues that substantial evidence supports the executive director's findings, conclusions, and decisions regarding operational delays, microsurfacing, and return of liquidated damages. As previously noted, there is no evidence in the record supporting the executive director's decision to reduce Mid-South's efficiency by a factor of 50%; therefore, we conclude that the executive director's findings, conclusions and decision regarding operational delays are not supported by substantial evidence. With regard to the executive director's findings, conclusions and decisions on microsurfacing and return of liquidated damages, we find that, based on Stucker's testimony, there is substantial evidence to support the executive director's decision. Nevertheless, as explained above, we conclude that the executive director's decision was arbitrary and capricious. Accordingly, we overrule TxDOT's third and fourth issues.

***Mid-South's Claim on Cross-Appeal***

In a single issue on cross-appeal, Mid-South argues that the district court erred in denying Mid-South's claim for interest under the Prompt Payment Act. *See* Tex. Gov't Code Ann. §§ 2251.002 (exceptions to interest payments), .026 (authorizing interest payments by state agencies). Section 2251.002 of the government code provides that where there is a bona fide dispute between a political subdivision and a vendor, contractor, subcontractor, or supplier that causes a payment to be late, interest is not due on that payment. *See id.* § 2251.002(a)(1).[21] Because the

_____

[21] We note that section 2251.002 was amended in 2003, but the amendment provided that it only applied to contracts executed after September 1, 2003. *See* Act of May 28, 2003, 78th Leg., R.S., ch. 286, § 4(b), 2003 Tex. Gen. Laws 1252, 1255. The parties agree that because the contract at issue here was executed in 1998 the pre-2003 version of section 2251.002 applies. The parties

district court found that a bona fide dispute existed between Mid-South and TxDOT, the district court affirmed the final order finding that Mid-South was not entitled to interest. We disagree.

Section 2251.026(a) of the Prompt Payment Act provides that state agencies, like TxDOT, are liable for interest on overdue payments.[22] *Id.* § 2251.026(a) (West Supp. 2007). In the case of a disputed payment, section 2251.042 provides that a vendor, like Mid-South, is entitled to interest if the dispute is resolved in the vendor's favor. *See id.* § 2251.042 (West 2000).

Moreover, the exception for a "bona fide dispute" found in section 2251.002(a)(1) applies only to political subdivisions, not state agencies. *Id.* § 2251.002(a)(1). That exception provides:

> This chapter does not apply to a payment made by a *governmental entity*, vendor, or subcontractor if: . . . there is a bona fide dispute between the *political subdivision* and

---

also agree that the 2003 amendments do not affect the outcome of this appeal because there were no substantive changes to the relevant provisions in the statute. Therefore, we cite to the current version of the statute.

[22] Prior to its amendment in 2001, section 2251.026(a) provided:

> If the warrant for a payment the originating state agency owes is not mailed or electronically transmitted before the payment is overdue, the agency is liable for an interest payment that accrues under this chapter.

Act of May 4, 1993, 73rd Leg., R.S., ch. 268, § 1, 1993 Tex. Gen. Laws 583, 845, *amended by* Act of May 20, 1997, 75th Leg., R.S., ch. 634, § 3(a), 1997 Tex. Gen. Laws 2179, 2180 (current version at Tex. Gov't Code Ann. § 2251.026(a) (West Supp. 2007)). The current version of section 2251.026(a) provides:

> A state agency is liable for any interest that accrues on an overdue payment under this chapter and shall pay the interest from funds appropriated or otherwise available to the agency at the same time the principal is paid.

Tex. Gov't Code Ann. § 2251.026 (West Supp. 2007).

a vendor, contractor, subcontractor or supplier about the goods delivered or the services performed that causes the payment to be late.

*Id.* (emphases added). The Prompt Payment Act's definition of "governmental entity" confirms this distinction. *See id.* § 2251.001(3) (West Supp. 2007). Section 2251.001(3) defines "governmental entity" as "a state agency or political subdivision of this state." *Id.* TxDOT is a state agency, not a political subdivision. Because the plain language of section 2251.002(a)(1) references only "a bona fide dispute between the *political subdivision* and a vendor, contractor, subcontractor, or supplier," the exception in section 2251.002(a)(1) does not apply to TxDOT—a state agency—and it is not relevant whether a bona fide dispute existed between Mid-South and TxDOT. For these reasons, we conclude that the district court erred in its judgment that Mid-South was not entitled to interest.

The record reflects that the ALJ awarded interest to Mid-South on those claims in which he recommended that Mid-South prevail. The ALJ noted that TxDOT did not dispute the accrual dates urged by Mid-South.[23] Nor did TxDOT dispute the interest rates urged by Mid-South.[24] The executive director adopted the ALJ's recommendations that Mid-South prevail on Claim Nos. 1, 4, 9, and 13, and TxDOT has not challenged those determinations on appeal. We conclude that

[23] Mid-South urged accrual dates of July 20, 2000 for Claim No. 12; October 3, 1999, for claim No. 14; and October 3, 1999, for all other claims.

[24] Based on section 2251.025(b) of the government code, Mid-South urged an interest rate of 1% per month through June 30, 2004, and 5% per annum (the Wall Street Journal prime rate as of July 1, 2003, plus 1%) thereafter. *See* Tex. Gov't Code Ann. § 2251.025(b) (West 2000 & Supp. 2007). Although TxDOT did not dispute the interest rates urged by Mid-South, we note that section 2251.025(b) was amended in 2003, and the legislature provided that the amendments do not apply to a payment that became overdue before September 1, 2004. *See* Act of June 2, 2003, 78th Leg., R.S., ch. 1310, § 122(f), 2003 Tex. Gen. Laws 4748, 4794-95. The rate of interest for such a payment is "the rate determined under the law in effect before July 1, 2004, and the former law is continued in effect for that purpose." *Id.*

35

Mid-South is entitled to interest on Claim Nos. 1, 4, 9, and 13 based on the amounts originally awarded by the executive director for those claims. With regard to the additional claims that we have remanded—including Claim No. 2 for reduced lane closures/operational delays; Claim No. 12 for microsurfacing; and Claim No. 14 for return of liquidated damages—we conclude that Mid-South is entitled to interest based on the amounts ultimately awarded on remand. Accordingly, we sustain Mid-South's issue on cross-appeal, and we remand for further proceedings to determine the interest due on Mid-South's claims.

## CONCLUSION

Having considered all of the claims raised on appeal by both TxDOT and Mid-South, we affirm the district court's judgment reversing the final order in part, and we reverse in part and remand this cause to TxDOT for further proceedings consistent with our opinion as authorized under section 2001.174(2) of the APA. *See* Tex. Gov't Code Ann. § 2001.174(2) (West 2000). With the exception of the issue regarding interest due Mid-South, we limit the scope of this remand to the record previously established by the parties before the ALJ. *See Texas Health Facilities Comm'n v. Nueces County Hosp. Dist.*, 581 S.W.2d 768, 770 (Tex. Civ. App.—Austin 1979, no writ) (limiting scope of remand under similar statute); *First Sav. & Loan Assoc. v. Lewis*, 512 S.W.2d 62, 64 (Tex. Civ. App.—Austin 1974, writ ref'd n.r.e.) (court may control scope of its remand).

_____

Jan P. Patterson, Justice

Before Justices Patterson, Puryear and Pemberton

Affirmed in part; Reversed and Remanded in part

Filed:   December 19, 2007