# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-04-00782-CV

Jordan Paving Corporation, Appellant

v.

Texas Department of Transportation, Appellee

FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT
NO. GN402074, HONORABLE DARLENE BYRNE, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This appeal arises from a dispute over a highway construction contract between Jordan Paving Corporation and the Texas Department of Transportation (the "Department"). *See* Tex. Transp. Code Ann. § 201.112 (West Supp. 2008). Jordan Paving filed an administrative complaint, which the Department denied, and a hearing was subsequently held before an administrative law judge at the State Office of Administrative Hearings (SOAH). In the agency's final order, the executive director rejected several of the ALJ's proposed findings of fact and conclusions of law and substituted his own findings and conclusions. Jordan Paving filed suit in district court seeking judicial review. *See id.* § 201.112(d). The district court affirmed the Department's final order, and this appeal followed. For the reasons set forth below, we reverse the district court's judgment affirming the Department's order and remand this cause to the Department for further proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

On January 14, 1999, Jordan Paving entered into a highway construction contract with the Department to perform rehabilitation, paving, and related construction work on approximately seven miles of U.S. Highway 70 in Hale County. The contract price for the project, which included tearing up and removing asphalt and concrete in the existing road, reworking the base material, rebuilding the road, widening and adding shoulders in some locations, and then applying hot mix to the top of the road, was $4,991,761.42. All of the work under the contract was to be completed within 210 working days. If Jordan Paving failed to complete the work in a timely manner, the contract allowed the Department to impose liquidated damages of $1,000 per day.

Jordan Paving began work on the project on January 30, 1999. However, 21 change orders were issued during the course of the project and, as a result, 119 working days were added to the project performance time. Jordan Paving completed the project on October 21, 2000, four days after the targeted completion date, and the Department imposed $4,000 in liquidated damages.

Following the Department's acceptance of the project, Jordan Paving initiated administrative proceedings under section 201.112 of the transportation code for additional compensation in the amount of $653,660.11, plus attorneys' fees and costs.[1] After the Department denied Jordan Paving's claims, Jordan Paving requested a contested case hearing before an ALJ. The case was referred to SOAH, and a four-day hearing was held in August 2003. The ALJ prepared a proposal for decision ("PFD") recommending that a portion of Jordan Paving's claims, totaling

_____

[1] At the SOAH hearing, Jordan Paving amended the amount of its claim to $525,735.96, including a refund of the liquidated damages assessed by the Department, and dismissed its claim for attorneys' fees and costs.

$298,794.30, be granted. The ALJ's recommendation included $290,994.30 in delay damages, $3,800 for the cost of an additional month of barricades, and payment of the $4,000 the Department had withheld as liquidated damages.

After considering the PFD, the Department's executive director issued a final order in which he specifically declined to adopt any findings of fact or conclusions of law that stated that Jordan Paving, by a preponderance of evidence, had met its burden to show that the decisions of the Department's area engineer were based on partiality, fraud, misconduct, or gross error as would imply bad faith or failure to exercise honest judgment. The executive director adopted the remaining findings of fact and conclusions of law and awarded Jordan Paving $3,800 for the cost of an additional month of barricades, as agreed by the parties. Jordan Paving sought judicial review in district court, which affirmed the Department's final order.

On appeal, Jordan Paving seeks the ALJ's recommended $290,994.30 in damages caused by a delay in the Department's approval of Jordan Paving's hot-mix design and payment of the $4,000 the Department withheld as liquidated damages.

Hot mix consists of aggregate, asphalt, and other additives. The job mix formula (JMF) for the hot mix lists the percentage of each material component and identifies the combined aggregate gradation. Samples of the JMFs are tested by both the contractor and the Department for various characteristics, including laboratory molded density, combined aggregate gradation, and asphalt content, to ascertain whether they meet the specifications set forth in the contract. The hot-mix design formula is commonly referred to as the JMF-1. After the contractor provides a JMF-1 that is approved by the Department, the contractor begins producing trial batches of hot mix.

3

The trial mix batches are referred to as the JMF-2s. The JMF-2 batches are then tested to determine whether they meet the parameters of the approved JMF-1. When the Department approves the JMF-2 trial batch, the contractor begins production. Once the hot mix is being produced and applied to the road surface, the hot-mix formula is then referred to as the JMF-3.

Jordan Paving owns and operates a hot-mix plant in Estelline, Texas. Jordan Paving intended to produce the hot mix for the Hale County project at that plant and transport it by truck to Hale County. Jordan Paving hired Cornerstone Labs to create the hot mix design for the project. The first JMF-1 design that Cornerstone submitted to the Department failed the Department's lab density test. Cornerstone created a second design known as JMF-1(2) and submitted that to the Department on August 7, 2000.

On August 9, 2000, a hot-mix meeting was held in Plainview between representatives of the Department and Jordan Paving in the office of Mike Craig, the Department's area engineer, to discuss the upcoming paving work to be performed on the project. At this meeting, Jordan Paving was informed that the Department's density test results of Jordan Paving's JMF-1(2) were low and outside the acceptable tolerances provided by the project specifications. The molded density of the hot mix design had to achieve a density percentage between 95 percent and 97 percent. Jordan Paving's private testing laboratory reported a passing density of 96 percent on the JMF-1(2). However, the Department's tests on the JMF-1(2) reflected a failing density result of 94.3 percent. Department representatives offered to allow Jordan Paving to begin trial batches if Jordan Paving would raise the asphalt content of its hot-mix formula to 5.3 percent. Jordan Paving agreed to the proposal, and the design became JMF-1(3), the approved design.

4

At the time of the hot-mix meeting in August 2000, Jordan Paving was nearing completion of another hot-mix job in Wheeler, Texas. Because Jordan Paving was finishing the Wheeler job, it had to decide where next to take its hot-mix equipment and trucks, either to Hale County or to a project Jordan Paving had waiting in Childress. Jordan Paving's primary concern when determining where to move its equipment was that it be moved to a project where work was ready to be performed, because allowing the hot-mix plant, equipment, and associated employees to sit idle cost Jordan Paving $27,181.30 per day. Accepting the Department's offer to allow Jordan Paving to go directly into the production of trial batches, that is, production of JMF-2s, Jordan Paving moved its entire hot-mix operations to Hale County.

On August 15 or 16, 2000, the first trial batch was run using 5.3 percent asphalt. That trial batch reflected a density of 99.6 percent on the Department's test and 98.1 percent on Jordan Paving's test. Trial batch 2, run on August 16, and trial batch 3, run on August 17, failed both Jordan Paving's and the Department's lab density tests, as well as the Department's test on gradation. However, trial batch 4, run on August 17, passed Jordan Paving's lab density test (96.4 percent), passed both parties' tests on gradation, but failed the Department's lab density test (97.4 percent). Based on the data from the first four trial batches, Jordan Paving was optimistic it would be able to achieve a passing density if it dialed the asphalt content back down to the original 4.9 percent asphalt. However, Craig did not permit this modification, and Jordan Paving was directed to shut down its trial batch operation and redesign the mix.

After redesigning, Jordan Paving submitted JMF-1(4) on August 22. JMF-1(4) passed all tests and was verified as JMF-2 on August 23. Once again, Jordan Paving began running

trial batches. Trial batches 5 though 9 were run between August 23 and August 25, and all failed one or more tests. Finally, trial batch 10, run on August 25, passed all tests. Jordan Paving went into production on August 28, and it completed the paving operation 16 work days later, on September 18, 2000.

## DISCUSSION

Jordan Paving contends the Department's executive director erred in failing to adopt the ALJ's proposed findings of fact and conclusions of law in their entirety. Specifically, Jordan Paving argues that: (1) the executive director failed to comply with the requirements in section 2001.058(e) of the government code when changing the ALJ's findings and conclusions of law; (2) substantial evidence does not support the executive director's findings and conclusions of law regarding the delay in the Department's approval of Jordan Paving's hot mix design and return of liquidated damages; (3) the Department breached its contract with Jordan Paving; (4) and the executive director acted arbitrarily and capriciously by failing to adopt all of the ALJ's proposed conclusions of law.

### Standard of Review

We review the Department's final order under the substantial evidence rule. *See* Tex. Transp. Code Ann. § 201.112(d); Tex. Gov't Code Ann. § 2001.174 (West 2008). "Broadly speaking, the substantial evidence rule is a court review device to keep the courts out of the business of administering regulatory statutes enacted by the Legislature; but it remains the business of the courts to see that justice is administered to competing parties by governmental agencies."

6

*Lewis v. Metro. Savs. & Loan Ass'n*, 550 S.W.2d 11, 13 (Tex. 1977). We presume under a substantial evidence review that the agency's order is supported by substantial evidence, and the appellant has the burden of overcoming the presumption. *State v. Mid-South Pavers, Inc.*, 246 S.W.3d 711, 721 (Tex. App.—Austin 2007, pet. denied)*; see also Graff Chevrolet Co., Inc. v. Texas Motor Vehicle Bd.*, 60 S.W.3d 154, 159 (Tex. App.—Austin 2001, pet. denied)*.* When applying the substantial evidence standard to an agency decision, we review the record to determine whether some reasonable basis exists for the agency's action. *Central Power & Light Co. v. Public Util. Comm'n*, 36 S.W.3d 547, 557 (Tex. App.—Austin 2000, pet. denied). We may not substitute our judgment for that of the agency on matters committed to agency discretion. Tex. Gov't Code Ann. § 2001.174*; H. G. Sledge, Inc. v. Prospective Inv. & Trading Co., Ltd.*, 36 S.W.3d 597, 602 (Tex. App.—Austin 2000, pet. denied)*.* We will reverse the agency's order if the decision is not reasonably supported by substantial evidence, is arbitrary or capricious, or is characterized by an abuse of discretion. *See* Tex. Gov't Code Ann. § 2001.174(2)(E), (F).

**Transportation Code § 201.112 versus Government Code § 2001.058(e).**

In its first issue, Jordan Paving asserts the executive director's changes to the ALJ's findings of fact and conclusions of law fail to meet the standards set forth in section 2001.058 of the government code. The Department, however, argues the executive director need only satisfy the requirements set forth in section 201.112(c) of the transportation code when making changes to the PFD.

We agree with the Department that section 2001.058 does not apply in this case. As we noted in *Mid-South Pavers:*

7

> The plain language of section 201.112(c) specifies that section 201.112(c) of the transportation code, not section 2001.058 of the government code, governs the executive director's discretion to make changes in a PFD.

246 S.W.3d at 721. Jordan Paving's first issue on appeal is overruled.

**The Gross-Error Standard**

The ALJ applied the gross-error standard to Jordan Paving's claims. The gross-error standard applies when the parties to a contract agree to be bound by a referee's decision. *Texas Dep't of Transp. v. Jones Bros. Dirt & Paving Contractors, Inc.,* 92 S.W.3d 477, 480 (Tex. 2002). A referee's decision under the gross-error standard is final and conclusive "unless in making it [the referee] is guilty of fraud, misconduct, or such gross mistake as would imply bad faith or failure to exercise honest judgment." *City of San Antonio v. McKenzie Constr. Co.,* 150 S.W.2d 989, 996 (Tex. 1941). Item 5.2 of the contract between the Department and Jordan Paving makes it clear the engineer's decision binds both parties: "The Engineer will act as referee in all questions arising under the terms of the contract between the parties thereto and his decisions shall be final and binding." We conclude the plain language of Item 5.2 supports application of the gross-error standard to Jordan Paving's claims. *See Jones Bros.,* 92 S.W.3d at 480.

After reviewing the evidence, the ALJ determined that Craig, the Department's area engineer, breached the contract and committed gross error when he ordered Jordan Paving to stop running trial batches and redesign. For the following reasons, the ALJ concluded Craig did much more than err or make a decision with which another engineer might disagree: Craig departed from the terms of the contract; his actions denied Jordan Paving rights expressly provided it in the

8

contract; he disregarded the obvious; and he relied on an unwritten Lubbock district rule or practice of which Jordan Paving had no notice.

The ALJ proposed the following findings of fact as the basis for her determination that Craig's mistake was so gross as to be arbitrary and capricious and to imply bad faith or a failure to exercise an honest judgment:

36.     At the [hot mix] meeting [on August 9, 2000], Department representatives offered to let [Jordan Paving] start producing trial batches if [Jordan Paving] would raise the asphalt content to 5.3 percent and use two percent lime.

38.     At the meeting, Department representatives represented to [Jordan Paving] that they would work with [Jordan Paving] to achieve passing results in the trial batches if [Jordan Paving] would make the design changes they suggested and mobilize its hot mix laying equipment at the Hale County Project.

39.     By the end of the hot mix meeting, [Jordan Paving] had agreed to use 5.3 percent asphalt, instead of 4.9 percent asphalt, and to use two percent lime, instead of one percent lime.

41.     As a result of the meeting, the approved design, containing 5.3 percent asphalt and two percent lime, became JMF-1(3).

47.     As of August 9, 2000, [Jordan Paving] had the choice of moving its hot mix equipment next to a project in Childress, Texas (where it already had an approved JMF) or to the Hale County Project.

48.     In reliance on the agreement the parties reached at the hot mix meeting, [Jordan Paving] moved its hot mix laying equipment to the Hale County Project and filled the tanks at its hot mix plant with the [asphalt] required for the Hale County Project.

51.     Every one-tenth percent increase in asphalt should result in a four-tenths to six-tenths percent increase in lab density.

9

53. On the first trial batch using 5.3 percent asphalt, run on August 15 or 16, 2000, the density shot up to 99.6 percent on the Department's test and 98.1 percent on [Jordan Paving's] test.

54. In light of Finding of Fact No. 51, the increase from 94.3 percent to 99.6 percent was extreme and suggested an error in either the Department's JMF-1(2) test results or the Department's trial batch 1 results.

57. Trial batch 4, run on August 17, 2000, passed [Jordan Paving's] lab density test (96.4), passed both parties' tests on gradation, but failed the Department's lab density test (97.4).

59. Trial batch 4 failed the Department's lab density test by only 0.4 percent (too high).

60. Special Specification Item 3022 [of the contract] provided that the contractor could adjust the JMF during trial batches, within certain limitations and provided the asphalt content stayed within plus or minus 0.5 percent of the approved JMF-1.

61. After trial batch 4, [Jordan Paving] requested that it be permitted to dial the asphalt content back down to the original 4.9 percent, in accordance with the specification described in Finding of Fact No. 60.

62. Mr. Craig did not permit [Jordan Paving] to make this modification.

63. On August 17, 2000, pursuant to a decision made by Mr. Craig, [Jordan Paving] was directed to shut down its trial batch operation and redesign the hot mix.

64. In ordering [Jordan Paving] to shut down and redesign when he did, Mr. Craig relied on an unwritten rule or practice in the Lubbock district whereby a contractor will be shut down and required to redesign after four failed trial batches.

65. The contract documents do not reflect the Lubbock district's unwritten rule or practice of permitting only four trial batches before shutting a contractor down and requiring it to redesign.

66.     [Jordan Paving] had no notice of the Lubbock district's unwritten rule or practice of permitting only four trial batches before shutting a contractor down and requiring it to redesign.

67.     JMF-1(3), the design [Jordan Paving] was using in trial batches 1-4, was not [Jordan Paving's] own creation, but the Department's design.

68.     JMF-1(3) was created in a manner not in accordance with Special Specification Item 3022.

69.     After trial batches 1-4 had been run, Mr. Craig knew or should have known that the asphalt content of the hot mix design needed to be reduced.

70.     Mr. Craig knew that requiring [Jordan Paving] to redesign after trial batch 4 would delay [Jordan Paving's] ability to begin laying hot mix on the Hale County Project.

78.     Pursuant to the *Standard Specifications for Construction and Maintenance of Highways, Streets, and Bridges*, Section 1.58, an engineer must abide by principles incorporated in or consistent with the individual contract.

79.     Special Specification Item 3022 permitted the contractor to deviate from JMF-1 and determine the "optimal mixture ingredients" for JMF-2, provided the contractor met the requirements set forth in the specifications and the asphalt content did not deviate from the JMF-1 by more than plus or minus 0.5 percent.

80.     Special Specification Item 3022 gave the engineer the right to require a contractor to redesign when an approved trial mixture "cannot be produced from JMF 1" but contained no warning that a contractor would be shut down and forced to redesign after four unsuccessful trial batches.

81.     At the time Mr. Craig required [Jordan Paving] to shut down and redesign, an approved trial mixture could have been produced from JMF-1(3) had [Jordan Paving] been permitted to reduce the asphalt content.

11

82.    In shutting [Jordan Paving] down in the circumstances summarized above, Mr. Craig did more than err or make a decision with which another engineer might disagree.

83.    In denying [Jordan Paving] permission to reduce the asphalt content after trial batch 4, Mr. Craig departed from the terms of the contract, denied [Jordan Paving] rights expressly provided it in the contract, and disregarded the obvious, *i.e.*, that the asphalt content of the mix needed to be reduced.

The ALJ also proposed the following finding of fact regarding Craig's decisions:

71.    Mr. Craig's assertion that his decisions were based on concerns about the gradations in [Jordan Paving's] stockpile was not supported by credible evidence.

The executive director in his final order found the following:

[T]here was insufficient evidence to find that the engineer's decisions were based on partiality, fraud, misconduct, or gross error as would imply bad faith or failure to exercise honest judgment. The Executive Director finds that there is credible evidence to support concerns about graduation [sic] of the stockpile (contrary to FoF No. 71); in shutting [Jordan Paving] down, the engineer did not do more than err or make a decision with which another engineer might disagree (contrary to FoF No. 82); denying permission to reduce the asphalt content was within the terms in the contract (contrary to FoF No. 83); and [Jordan Paving] is not entitled to delay damages or liquidated damages (contrary to FoF Nos. 96 and 108).

The executive director also found that the engineer worked within the provisions of the contract, contrary to proposed conclusion of law 9, which stated the engineer did not follow the provisions of the contract as required by the *Standard Specifications for Construction of Highways, Streets, and Bridges* Section 1.58 (1995).

The ALJ's proposed conclusion of law 10 stated that Jordan Paving showed by a preponderance of the evidence that the engineer's decisions to deny Jordan Paving's request to reduce the asphalt content after trial batch 4, to require Jordan Paving to stop producing trial batches,

12

and to require Jordan Paving to redesign were based on gross error and, therefore, breached the contract. Conclusion of law 11 as proposed by the ALJ found that the engineer's error was so gross as to be arbitrary and capricious and to imply bad faith or a failure to exercise an honest judgment. The executive director, however, found that Jordan Paving "failed to show by the preponderance of the evidence that the engineer's decision to deny the reduction of asphalt content met the standard of review (contrary to CoL Nos. 10 and 11)."

**Compliance with Section 201.112**

Jordan Paving argues the Department's failure to adopt the ALJ's proposed findings of facts and conclusions of law is not supported by substantial evidence and was arbitrary and capricious. The Department responds that section 201.112(c) allows the executive director to change a finding of fact or conclusion of law at his discretion as long as he provides a written statement containing the reason and legal basis for the change. In this case, the Department argues the executive director gave a written explanation and briefly identified the reasons for the changes to the ALJ's findings and conclusions. Because we conclude the executive director failed to comply with section 201.112 when making changes to the ALJ's findings of fact and conclusions of law and acted arbitrarily and capriciously, we sustain Jordan Paving's second, fifth, and sixth issues.

The executive director's authority to change a finding of fact or conclusion of law is not unlimited. *Mid-South Pavers*, 246 S.W.3d at 722. Although section 201.112 allows the executive director to make changes to an ALJ's proposed finding of fact or conclusion of law, the statute requires that "the director shall provide a written statement containing the reason and legal basis for a change made under this subsection." Tex. Transp. Code Ann. § 201.112(c). In addition,

13

the executive director's final order must be supported by substantial evidence considering the reliable and probative evidence in the record as a whole. *See id.* § 201.112(d); Tex. Gov't Code Ann. § 2001.174. Moreover, the final order must not exceed the agency's statutory authority; must be free of constitutional, statutory, procedural, or other legal error; and may not be arbitrary or capricious or otherwise characterized by an abuse of discretion. *See* Tex. Gov't Code Ann. § 2001.174.

In determining whether the executive director acted arbitrarily and capriciously, we must decide whether the final order was based on a consideration of all relevant factors and whether there is a rational connection between the facts and the executive director's decision. *Mid-South Pavers*, 246 S.W.3d at 726; *Starr County v. Starr Indus. Servs., Inc.*, 584 S.W.2d 352, 355-56 (Tex. Civ. App.—Austin 1979, writ ref'd n.r.e.). We may not substitute our judgment for that of the agency. *Id.*

The legislature in section 201.112 has expressly required the executive director to provide a written statement containing the reason and legal basis for each change to the ALJ's findings or conclusions. Tex. Transp. Code § 201.112(c); *Mid-South Pavers*, 246 S.W.3d at 728; *see also Levy v. Texas State Bd. of Med. Exam'rs*, 966 S.W.2d 813, 816 (Tex. App.—Austin 1998, no pet.) (agency required to "articulate *specifically* its reasons *for each individual change made*"). Contrary to the Department's assertion that it identified the reasons for the executive director's changes, our review of the final order shows that the executive director changed findings of fact 71, 82, 83, 96, and 108 and conclusions of law 9, 10, 11, 12, and 14, and declined to adopt findings of fact 106 and 107, without providing a written statement for each individual change to the ALJ's

14

findings of fact and conclusions of law that explains the executive director's rationale and legal basis for each change, as required by section 201.112(c). By not providing a written statement for each individual change to the ALJ's findings of fact and conclusions of law that explained the executive director's rationale for each change, the executive director failed to comply with section 201.112(c).

The executive director's changes to particular findings and conclusions proposed by the ALJ suggest the executive director was acting as the Department's factfinder, despite the legislature having delegated that responsibility to the ALJ in section 201.112(b). *See Mid-South Pavers*, 246 S.W.3d at 722; *Montgomery Indep. Sch. Dist. v. Davis*, 34 S.W.3d 559, 564 (Tex. 2000) ("Having chosen to delegate the fact-finding role to the hearing-examiner, a board cannot then ignore those findings with which it disagrees and substitute its own additional findings."). By failing to comply with the requirement to provide a written statement containing the reason and legal basis for changing the ALJ's findings and conclusions, the executive director's decision in his final order raises serious due process concerns.

An agency must respect the due process rights of parties that appear before it in contested cases. *See Mid-South Pavers*, 246 S.W.3d at 722; *Flores v. Employees Ret. Sys.*, 74 S.W.3d 532, 539 (Tex. App.—Austin 2002, pet. denied) (citing *Texas State Bd. of Pharmacy v. Seely*, 764 S.W.2d 806, 815 (Tex. App.—Austin 1988, writ denied)). Section 201.112 contemplates that, when a contractor is dissatisfied with the Department's informal resolution of its claims, the contractor may request a formal administrative hearing to resolve those claims under chapter 2001 of the government code. *Mid-South Pavers*, 246 S.W.3d at 722; *see* Tex. Transp. Code Ann. § 201.112(b); Tex. Gov't Code Ann. § 2001.051 (West 2008) (opportunity for contested case hearing). Under the

15

transportation code and the Department's rules, the hearing is delegated to an ALJ at SOAH. *See* Tex. Transp. Code Ann. § 201.112(b)-(c); 43 Tex. Admin. Code §§ 1.21-.33 (procedures in contested cases), 9.2(g)(3)(D) (ii) (request for contested case hearing) (West 2008). A hearing gives litigants an opportunity to present evidence, and any conflicts in the evidence are resolved by the decision-maker by weighing the evidence and evaluating the credibility of witnesses. *Mid-South Pavers*, 246 S.W.3d at 723.[2] Because the ALJ has heard the evidence and observed the witnesses' demeanor, the ALJ is in a superior position relative to an agency head or board reviewing the ALJ's proposed decision to make those determinations. *Mid-South Pavers*, 246 S.W.3d at 723 (citing 2 Kenneth Culp Davis & Richard J. Pierce, Jr., *Administrative Law Treatise* § 9.8 at 67 (3d ed.1994)).

By allowing a dissatisfied contractor to request a formal administrative hearing under section 201.112(b), the legislature has recognized the importance of a neutral decision-maker. *Mid-South Pavers*, 246 S.W.3d at 723. The legislature has also limited the executive director's discretion to make changes to the ALJ's proposed findings of fact and conclusions of law by requiring the executive director to provide a written statement of the reason and legal basis for each change. *Id.;* Tex. Transp. Code § 201.112(c). The supreme court recognized the importance of this limitation in *Montgomery Independent School District v. Davis*:

> If a board could find additional facts, resolving conflicts in the evidence and credibility disputes, it would then be serving as its own factfinder despite delegating the factfinding role to a hearing examiner, and the process would be meaningless. An independent factfinder is integral to the structure of the hearing-examiner process. . . . The Legislature has further protected the independent nature of the hearing-

---

[2] *See* F. Scott McCown, *When Can an Agency Change the Findings or Conclusions of an Administrative Law Judge?* 50 Baylor L .Rev. 65, 74 (1998).

examiner process by requiring the board to state in writing the reason, including the legal basis for any change or rejection it makes . . . .

34 S.W.3d at 564.

In finding of fact 71, the ALJ determined there was no credible evidence supporting Craig's assertion that his decisions to shut down Jordan Paving and require it to redesign were based on concerns about the gradations in Jordan Paving's stockpile. In the PFD, the ALJ pointed out that Craig testified that he had obtained information about the gradations from Ricky Walker, the Department's lab supervisor in the Lubbock district, and Chris Cunningham, the Department's hot mix specialist at Jordan Paving's hot mix plant. Noting that the gradations in trial batch 4 passed both Jordan Paving's tests and the Department's tests, the ALJ observed that neither Craig nor any other Department witness provided persuasive evidence to support the Department's contention that Jordan Paving needed to redesign.[3] The Department responds that, in changing finding of fact 71, the executive director was "correcting" the ALJ's error.

The executive director's failure to provide an explanation for the change made to finding of fact 71 demonstrates that the executive director abused his discretion in making the change and that his decision was arbitrary and capricious. *See Mid-South Pavers*, 246 S.W.3d at 727. The ALJ determined the witnesses' credibility when she explained that neither Craig nor any other Department witness provided "credible evidence" that Jordan Paving needed to redesign based on concerns about the gradations in Jordan Paving's stockpile. Although the executive director found

---

[3] In the PFD, the ALJ noted that the Department elected not to call Cunningham as a witness, even though he had been present at the hearing and knew more about Jordan Paving's plant and its controls than the other witnesses.

17

that there was credible evidence to support concerns about gradation, he provided no explanation to support his decision. Because he did not hear the testimony or evaluate the witnesses' demeanor but chose to resolve the conflict in credibility in favor of the Department, the executive director's failure to explain his finding that the Department witnesses provided credible evidence undercuts his determination, rendering it arbitrary and capricious.

We conclude that the executive director's decision was arbitrary and capricious and an abuse of discretion. Without knowing on what facts the executive director relied to make his finding of "credible evidence," there is no rational connection between the facts and the executive director's decision. *See Mid-South Pavers*, 246 S.W.3d at 727. We have, in *Mid-South Pavers*, already rejected the Department's argument that section 201.112(c) permits the executive director to weigh the evidence anew, substitute his own credibility determinations in place of those made by the ALJ, and change an ALJ's finding of fact or a conclusion of law at his unfettered discretion. *Id. See also Davis*, 34 S.W.3d at 564; *Flores*, 74 S.W.3d at 540. On this record, where the ALJ, not the executive director, heard the testimony and observed the demeanor of the witnesses and, in the absence of any explanation that points out evidence in the record to support the executive director's credibility choice, we conclude that the executive director's decision to reject the ALJ's findings based on credibility was arbitrary and capricious and an abuse of discretion. In light of this conclusion, we likewise conclude that the executive director's related changes to findings of fact 82 and 83 and conclusions of law 9, 10, and 11 were arbitrary and capricious and an abuse of discretion.

18

**Jordan Paving's Damages**

Regarding the amount of delay damages caused by the Department's action of shutting down Jordan Paving and requiring it to redesign JMF-1, the ALJ proposed the following findings of fact:

88. The Department's action, on or after August 17, 2000, of shutting [Jordan Paving] down and requiring it to redesign JMF-1 caused a delay of six working days in the beginning of [Jordan Paving's] hot paving operations.

90. When the Department required [Jordan Paving] to shut down and redesign, most of the truckers [Jordan Paving] had lined up could not afford to sit idle, waiting for the paving phase of the Hale County Project to begin, and so they left to find other work. As a result, [Jordan Paving] had fewer trucks available to haul the hot mix to the Hale [County] Project than it had planned.

91. [Jordan Paving] laid a total of 21,375.17 tons of hot mix on the Hale County Project.

92. On September 14, 2000, when [Jordan Paving] ran 35 trucks (a number similar to the number of trucks it ran at its peak on the Wheeler County Project), it laid 2,062.37 tons of hot mix.

93. Had [Jordan Paving] been able to run approximately 35 trucks every day on the Hale County Project, it would have been able to lay the 21,375.17 tons of hot mix in approximately 11 days, rather than the 16 days it took [Jordan Paving] to complete the paving job.

94. The Department's actions resulted in a five-day delay during the paving phase of the project.

95. [Jordan Paving's] calculation of its delay damages at a rate of $27,181.30 per day constitutes a reasonable and necessary charge . . . .

96.     [Jordan Paving] is entitled to recover 11 days' delay damages at the rate of $27,181.30 per day, for a total of $290,994.30.[4]

Regarding the amount of liquidated damages, the ALJ proposed the following findings of fact:

106.    The actions of the Department, as described in the foregoing Findings of Fact, delayed the project by 11 days.

107.    The four days it took [Jordan Paving] to complete work on the project, beyond the contract completion date, were attributable to the Department's actions.

108.    The Department should extend the contract performance period by four days and pay [Jordan Paving] the $4,000 in liquidated damages it previously assessed.

The ALJ determined in conclusion of law 12 that Jordan Paving was entitled to recover delay damages because it showed by a preponderance of the evidence that its work on the paving phase of the contract was delayed, that the Department's actions and inactions caused that delay, and that Jordan Paving was damaged by that delay. In conclusion of law 14, the ALJ found that the following of Jordan Paving's contract claims should be granted: Jordan Paving was entitled to $290,994.30 in delay damages,[5] $3,800,00 for the cost of an additional month of barricades, and payment of the $4,000.00 the Department previously withheld as liquidated damages, for a total of $298,794.30. The executive director found that Jordan Paving was not entitled to delay or liquidated damages (contrary to findings of fact 96 and 108) and concluded that Jordan Paving was not entitled

---

[4] The Court notes that 11 days' delay at the rate of $27,181.30 per day equals an amount of $298,994.30 in delay damages, rather than the $290,994.30 as found by the ALJ.

[5] As pointed out in footnote 4 above, the total amount of delay damages, at the rate of $27,181.30 per day for 11 days, equals $298,994.30

to recover delay and liquidated damages as the standard of review was not met (contrary to conclusions of law 12 and 14).

In light of our conclusion that the executive director's decisions on the issues of credibility were arbitrary and capricious and an abuse of discretion, we likewise conclude that the executive director's changes to findings of fact 96 and 108 and conclusions of law 12 and 14 were arbitrary and capricious and an abuse of discretion. We sustain Jordan Paving's third and fourth issues.

Our review of the final order shows that the executive director also declined to adopt findings of fact 106 and 107 but failed to provide the explanation required in section 201.112(c).

**CONCLUSION**

Having considered all the claims raised on appeal by Jordan Paving, we reverse the district court's judgment affirming the final order and remand this cause to the Department for further proceedings consistent with our opinion as authorized under section 2001.174(2) of the Administrative Procedures Act. *See* Tex. Gov't Code Ann. § 2001.174(2) (West 2008). We limit the scope of this remand to the record previously established by the parties before the ALJ. *See Mid-South Pavers*, 246 S.W.3d at 733; *Texas Health Facilities Comm'n v. Nueces County Hosp. Dist.*, 581 S.W.2d 768, 770 (Tex. Civ. App.—Austin 1979, no writ) (limiting scope of remand under similar statute); *First Sav. & Loan Assoc. v. Lewis*, 512 S.W.2d 62, 64 (Tex. Civ. App.—Austin 1974, writ ref'd n.r.e.) (court may control scope of its remand).

21

                                                          _____
_____J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Patterson and Puryear

Reversed and Remanded

Filed:   June 3, 2009

22